# HOBOKEN *v.* PENNSYLVANIA RAILROAD COMPANY.

## SAME *v.* SAME.

## SAME *v.* SCHMIDT.

## SAME *v.* SAME.

## SAME *v.* HAMBURG–AMERICAN STEAM PACKET COMPANY.

## SAME *v.* NORTH GERMAN LLOYD STEAMSHIP COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW JERSEY.

Argued February 8, 9, 1888. — Decided February 20, 1888.

The title of the Pennsylvania Railroad Company to its lands in controversy, derived by grant from the Hoboken Land and Improvement Company, was confirmed and enlarged by the act of the legislature of New Jersey of March 31, 1869, "to enable the United Companies to improve lands

under water at Kill von Kull and other places," and the title of the other defendants to their lands in controversy, also derived by grant from said Hoboken Company, was enlarged and confirmed by grants from the State, under the riparian act of the legislature of the same 31st March; and thus all these titles are materially distinguished from the title of the Hoboken Land and Improvement Company, (derived only through § 4 of its charter,) which was the subject of the decision of the highest court of the State of New Jersey in *Hoboken Land and Improvement Co.* v. *Hoboken,* 7 Vroom, (36 N. J. Law,) 540.

The act of the legislature of New Jersey of March 31, 1869, "to enable the United Companies to improve lands under water at Kill von Kull and other places" embraced but one object, and sufficiently indicated that object in its title, viz.: that it was intended to apply to the lands of the Pennsylvania Railroad Company in controversy in these actions; and thus it complied with the requirements of the constitution of New Jersey respecting titles to statutes.

By the laws of New Jersey lands below high-water mark on navigable waters are the absolute property of the State, subject only to the power conferred upon Congress to regulate foreign commerce and commerce among the States, and they may be granted by the State, either to the riparian proprietor, or to a stranger, as the State sees fit.

The grant by the State of New Jersey to the United Companies by the act of March 31, 1869, under which the Pennsylvania Railroad Company claims, and the grants under the general riparian act of the same date under which the other defendants claim, were intended to secure, and do secure, to the respective grantees the whole beneficial interest in their respective properties, for their exclusive use for the purposes expressed in the grants.

An estoppel cannot apply in this case to the State or to its successor in title.

Any easement, which the public may have in New Jersey to pass over lands redeemed by filling in below high-water mark in order to reach navigable waters, is subordinate to the right of the State to grant the lands discharged of the supposed easement.

A riparian proprietor in New Jersey has no power to create an easement for the public over lands below high-water mark, as against the State and those claiming under it; and if he attempts to do it, and then conveys to another person all his right to reclaim the land under water fronting his property, his grantee may acquire from the State the title to such land, discharged of the supposed easement.

The title of a grantee under the riparian acts of New Jersey differs in every respect from that of a riparian owner to the alluvial accretions made by the changes in a shifting stream which constitutes the boundary of his possessions.

The defendants in error hold the exclusive possession of the premises in controversy against the adverse claim of the plaintiff to any easement by virtue of the original dedication of the streets to high-water mark on the Loss map.

THE following is the case as stated by the court:

These are six actions of ejectment brought by the Mayor and Common Council of the City of Hoboken originally in the Supreme Court of New Jersey, and removed into the Circuit Court of the United States for that district by the several defendants, on the ground of citizenship or alienage. In that court they were tried as one case, the intervention of a jury having been duly waived in writing by the parties. Judgment was rendered in them severally for the defendants, to reverse which these writs of error have been sued out.

The general nature of the controversy is accurately stated by Judge Nixon, who tried the causes, in his opinion, as follows, 16 Fed. Rep. 816:

" The claim of the plaintiff is for an easement, and is based upon the dedication of certain streets, in the year 1804, by Col. John Stevens, who was then the owner of between 500 and 600 acres of land on the western shore of the Hudson River, where the city of Hoboken now stands, and who made 'a plan of the new city of Hoboken, 'n the county of Bergen,' and caused the same to be filed in the clerk's office of said county in the month of April, 1805. This plan, on the map known as the Loss map, exhibits a number of streets running north and south, and a still larger number running east and west, all of the latter, except one, apparently terminating on the river front at their eastern end, and one of the former having a like terminus on the south. Since that date, and by legislative authority, the river bed below the ancient high-water mark has been filled in for a long distance to the east and south of the land included in the Loss map, rendering the navigable water inaccessible from the streets as therein laid out and dedicated. This controversy has reference to extending one of these streets, not named on the map, but now called River Street, to the south, and four others, to wit, Newark Street, designated on the map the Philadelphia post road, and First, Second and Third streets, to the east, until they respectively reach the navigable water of the river. The city claims the right of extension by virtue and force of the Stevens dedica-

tion. The defendants resist it, asserting that the title of Col. Stevens was limited to high-water mark of the river in 1804; that the soil below the high-water mark, as it then existed, belonged to the State of New Jersey, which not only has never acquiesced in any easement over the land, but by various enactments has conferred upon the defendants or their grantors an absolute title inconsistent with any right of w? in the public over the same."

The facts in all the cases are embraced in a series of findings by the court constituting a single statement, as follows:

"(1) That the tract of land on which the city of Hoboken has been mainly built was formerly the property of Col. John Stevens, and contained originally five hundred and sixty-four acres.

"(2) That in the year 1804 Col. Stevens, then being the owner of said tract, caused to be made 'a plan of the new city of Hoboken, in the county of Bergen,' known as Loss's map, which was filed in the clerk's office of the county of Bergen, in April, 1805.

"(3) That the public streets laid out on said map running east and west extended eastwardly to the high-water mark of Hudson River as it then existed.

"(4) That the only street thereon running north and south which concerns the present controversy is now called River Street, and its southerly terminus on the map was at the high-water mark of said river.

"(5) That subsequent to the filing of said map Col. Stevens conveyed several lots or parcels of the land shown thereon to different persons, and describing the lots so conveyed by reference to the map and the streets delineated thereon, and that other owners deriving title from or under him have since conveyed lots within said plan, describing the same by reference to the map and streets.

"(6) That at the time of the filing of said map in the clerk's office the title to all the land fronting the said Stevens property and lying between high and low water mark of the west bank of the Hudson River was in the State of New Jersey.

"(7) That 'The Hoboken Land and Improvement Company' was incorporated by the legislature of said State by an act entitled 'An act to incorporate the Hoboken Land and Improvement Company,' approved February 21, 1838; that by § 1 of the act they were authorized to hold real estate, but the amount held by the company should not exceed 1000 acres at any time; that by the fourth section the company was empowered to purchase, fill up, occupy, possess, and enjoy all land covered with water fronting and adjoining the lands that might be owned by them, and to construct thereon wharves, piers, and slips, and all other structures requisite or proper for commercial and shipping purposes, provided that it should not be lawful for the company to fill up any such land covered with water, nor to construct any dock, pier, or wharf immediately in front of the lands of any other person or persons owning down to the water, without the consent of such persons first had in writing.

" (8) That by virtue of the powers and privileges of said act of incorporation the company purchased all the land and real estate described in the deed of conveyance from Edwin A. Stevens and others, bearing date May 6, 1839, and duly recorded in the clerk's office of the county of Bergen, in Liber 13 of Deeds, fol. 105, and in which, among other land, is included the tract of 564 acres embraced in the Loss map, and formerly the property of Col. Stevens.

" (9) That at the time of said transfer by Edwin A. Stevens and others to the said Hoboken Company the land for which these suits were brought by the city of Hoboken was under water, and since the date of said conveyance has been filled up, occupied, and possessed by said company or their grantees, and that all of said land under water was in front of and adjoining the real estate purchased by the company; that since the time of said purchase the company, or their grantees, have at various times reclaimed the land from the water and have constructed thereon wharves, harbors, piers and slips, and other structures requisite or proper for commercial purposes, and have been in the exclusive possession, occupancy, and enjoyment of the same from the time of such reclamation.

"(10) That the city of Hoboken was incorporated by the legislature of the State of New Jersey, by an act approved March 28, 1855, with the powers and privileges therein granted, *prout* the same, and that the territorial limits of the said city embraced all the lands shown on the Loss map, and also a large tract of real estate adjoining the same on the west, extending to the west line of the lands of the late John G. Coster, deceased, and that previous to said incorporation its territory embraced (a portion of) one of the townships of the county of Hudson.

" (11) That the city of Hoboken never by ordinance recognized River Street south of Third Street, and only recognized its existence as far south as Third Street by the ordinance of January 9, 1858; that Newark, First and Second streets were never recognized by ordinance east of Hudson Street prior to the ordinance of October 5, 1875, which ordinance provided that said streets should extend to high-water mark on the Hudson River; and that Third Street was never recognized east of River Street prior to the said ordinance of October 5, 1875, which ordinance also provided that the said street should extend to high-water mark of said river.

"(12) That no proceedings have been taken by the city to condemn the lands in controversy or to take them for the purposes of a public street, except the passage of the ordinance of 1875 and the bringing of these actions of ejectment claiming the dedication of the lands as a public street under the Loss map of 1804.

" (13) That the Hoboken Land and Improvement Company, in consideration of $68,583.33, executed a deed to the Camden and Amboy Railroad Company, dated December 1, 1864, conveying a tract of land at the foot or easterly end of Second Street, within the boundaries of which are embraced the premises that the plaintiff seeks to recover in the two suits against the Pennsylvania Railroad Company, and that the Camden and Amboy Railroad Company and its grantees or lessees have been in the possession of said lands since said conveyance.

" (14) That the legislature of the State of New Jersey, by a law approved March 31, 1869, authorized the united railroad

companies of New Jersey to reclaim and erect wharves and other improvements in front of any lands then owned by them or held in trust for them on any tide-waters of the State, and when so reclaimed and improved to have, hold, possess, and enjoy the same as the owners thereof, subject only to the provisions that they should pay for such grant unto the treasury of the State the sum of $20,000 before the first day of July next ensuing, and should also file in the office of the Secretary of the State a map and description of the lands under water in front of the upland designated in said act; that the sum of $20,000 was paid by the companies within the time limited and the map and description filed as required.   Exhibit D 9.

"(15) That an act of the legislature of New Jersey, supplementary to the act to ascertain the rights of the State and of riparian owners in the lands lying under water, approved April 11, 1864, was passed on the thirty-first of March, 1869; that by a proviso to the third section of the same 'all previous grants of lands under water or right to reclaim made directly by legislative act or grant or license power or authority so made or given to purchase, fill up, occupy, possess, and enjoy lands covered with water fronting or adjoining lands owned by the corporation, grantee, or licensee named in the legislative act mentioned, its, his, or their representatives, grantees, or assigns,' are excepted from the operation of said supplement; that in the fourth section of said act the riparian commissioners are authorized, for the consideration therein mentioned, to execute and deliver in the name of the State of New Jersey, to all persons coming within the terms of said proviso, a paper capable of being acknowledged and recorded, conveying and confirming to them the title to all lands, whether then under water or not, which were held by previous legislative grant or lease, either in the hands of the grantees or lessees or by their representatives or assigns.

"(16) That under the provisions of said act the State of New Jersey conveyed to the Hoboken Land and Improvement Company, by deed dated December 21, 1869, for the consideration of $35,500, so much of the land and premises purchased of Edwin A. Stevens and others as was originally below the

high-water mark of the river, and all lands under water in front of the same, and as was situate between Second and Fourth streets, if extended, and in front of Third Street, if extended, to the exterior bulkhead and pier lines established by the riparian commissioners, and embracing the premises claimed in the several suits against the Hamburg-American Steam Packet Company and the North German Lloyd Steamship Company, and that the said company and its grantees have been in the possession of said premises since the date of said conveyance.

"(17) That on the twenty-sixth of September, 1866, the Hoboken Land and Improvement Company and Edwin A. Stevens executed a conveyance to the New York Floating Dry Dock Company for certain lots and tracts of land, above and under water, in front of and to the east of First Street, and the northerly half of Newark Street, if extended, embracing the premises claimed in the suits against Adolph E. Schmidt and others; that the said The New York Floating Dry Dock Company transferred the same to Frederick Kuhne, trustee of the German Transatlantic Steam Navigation Company, by deed dated August 31, 1872, the said Kuhne, on the same day, executing a formal declaration of trust to the said company; that on the ninth of November, 1872, the State of New Jersey, in consideration of $22,625, granted and conveyed to said Kuhne, trustee as aforesaid, all the right and title of said State in and to the land and premises described in the above recited deed from the Hoboken Land and Improvement Company to the New York Floating Dry Dock Company, and that the same has been in the possession of the said respective grantees from the date of the respective conveyances.

"(18) That on the twenty-third of April, 1872, the Hoboken Land and Improvement Company made a conveyance to the North German Lloyd Steamship Company of a lot of land situate in front of and to the east of Third Street, if continued to the Hudson River, and embracing the premises claimed in the several suits against the North German Lloyd Steamship Company and the Hamburg-American Packet Company, and the premises have been in the possession of said company and its lessees since the date of said conveyance.

"(19) That River Street, as shown on the Loss map, cannot be extended to reach the navigable waters of the Hudson River without crossing land outside of that shown on said map and without crossing land which, prior to April 28, 1874, belonged to the State of New Jersey, and which the said State, by deed of that date, leased in perpetuity to the Morris and Essex Railroad Company. See Exhibit D 8."

Upon these facts the Circuit Court founded its conclusions of law, as follows:

"(1) That neither Col. John Stevens, in 1804, nor at any time thereafter, nor his grantees of any portion of the land delineated on the Loss map, had power to dedicate to the public use as a highway any part of the land or water adjoining said lands and lying east of and below high-water mark of the river as it then existed, and that said land under water belonged to the State of New Jersey, and could only be dedicated or subjected to an easement by the State and its grantees.

"(2) That the charter granted by the State of New Jersey to the Hoboken Land and Improvement Company was a contract between the State and the corporators; that the fourth section expressly authorized the corporation to fill up all lands covered with water fronting and adjoining the lands they might acquire, and to construct thereon wharves, harbors, piers, and slips, and all other structures requisite or proper for commercial or shipping purposes, and that the only restriction imposed upon the corporation by the act was that it should not fill up or build any dock, pier, or wharf upon any land under water 'immediately in front of the lands of any other person or persons owning down to the water;' and that neither the plaintiff in these suits nor the State of New Jersey nor the public was 'another person owning down to the water,' within the legal meaning and intent of said charter or contract.

"(3) That the provisions of the charter of incorporation of the plaintiff, so far as they are applicable to the subject of the pending controversy, negative the plaintiff's construction of its powers under said charter, in that (1) it withholds from

the corporate authorities any right or privilege as shore or riparian owners; (2) while it vests the council with power to take any lands that it may judge necessary for the opening of Third Street, it requires payment to be made to the owner for the fair value of the lands so taken and of the improvements thereon, and the damage done to any distinct lot or parcel or tenement by taking any part of it for such purposes; and (3) it expressly provides that nothing contained in the charter shall be so construed as to interfere with or impair the vested rights and privileges of any person or corporation whatever, except as to property taken for public use, upon compensation as provided for in the act.

"(4) That the State of New Jersey, being the absolute owner of the land under the water below high-water mark, which was the limit of the Stevens dedication of streets, had the right to fill in and make land as far as its ownership extended; that the soil thus acquired and redeemed from the water was in no sense alluvion or accretion, which became the property of the shore-owner, but remained the land of the state or its grantees, and that no right or authority existed in the shore-owner, by dedicating the public streets to the limits of its ownership, to charge such newly made land with the burden of an easement over it.

"(5) That as to the two several suits against the Pennsylvania Railroad Company, the *locus in quo* is embraced within the descriptions of the deed from the Hoboken Land and Improvement Company to the Camden and Amboy Railroad Company, dated December 6, 1864, and also within the grant of the State to the united railroad companies of New Jersey of the date of March 31, 1869, wherein the said companies were authorized, for the consideration therein expressed and afterwards paid, 'to reclaim and erect wharves and other improvements in front of any lands owned by or held in trust for them,' subject to no restriction other than the regulations as to solid filling and pier lines before recommended by the riparian commissioners, and that the defendant, who is the lessee of the said companies, is entitled to hold said premises against the claim of plaintiff, unless compensation be first made for the taking thereof according to law.

"(6) That as to the two several suits against Adolph E. Schmidt and others the *locus in quo* is covered by the description of the deed from the Hoboken Land and Improvement Company to the New York Floating Dry Dock Company, dated August 31, 1872, and also within the grant from the State by its commissioners, under the provisions of the fourth section of the supplement to the act entitled 'An act to ascertain the rights of the State and of the riparian owners,' etc., to Frederick Kuhne, trustee, etc., under whom the defendants hold by mesne conveyance, and that they are entitled to retain the possession and ownership of said premises against the plaintiff until the same is condemned and payment therefor made according to law.

"(7) That, as to the several suits against the Hamburg-American Steam Packet Company and the North German Lloyd Steamship Company, the *locus in quo* is within the grant from the State of New Jersey to the Hoboken Land and Improvement Company of the date of December 21, 1869, and also of the deed of conveyance from the Hoboken Land and Improvement Company to the North German Lloyd Steamship Company, dated April 23, 1872, and that the said defendants are entitled to hold the said premises clear and discharged of any right or claim therein or thereto by said plaintiff.

"(8) That none of the land and premises claimed by the plaintiff in either of the said several suits are subject to an easement in consequence of the dedication of public streets made by Col. John Stevens in the Loss map of 1804.

"(9) That the several defendants in the several suits should be adjudged not guilty."

*Mr. James F. Minturn* for plaintiff in error.

*Mr. James B. Vredenburgh* for the Pennsylvania Railroad Company, defendant in error.

*Mr. Barker Gummere* for the Pennsylvania Railroad Company, defendant in error.

*Mr. Leon Abbett* for Adolph E. Schmidt, Leopold Goldschmidt, The Hamburg-American Steam Packet Company

and The North German Lloyd Steamship Company, defendants in error.

Mr. *J. D. Bedle* for the Pennsylvania Railroad Company, defendant in error.

Mr. *Thomas N. McCarter* for plaintiff in error.

I. In determining the questions of title to land and the construction of the statutes of the State of New Jersey, the court can only inquire what is the law of New Jersey in regard to the questions involved; and, so far as this court can find that law settled, it is bound to adopt it for the purposes of this case. Rev. Stat. 2d ed., p. 137, § 721; and authorities collected in margin, particularly: *Webster* v. *Cooper*, 14 How. 488, 504; *Suydam* v. *Williamson*, 24 How. 427; *Chicago* v. *Robbins*, 2 Black, 418, 428; *Orvis* v. *Powell*, 98 U. S. 176; *Barney* v. *Keokuk*, 94 U. S. 324.

II. A case between the plaintiff in these suits and The Hoboken Land and Improvement Company, the grantor of all the defendants, has been determined in the highest court of the State of New Jersey, which settles and determines many of the questions necessary to be decided in these cases. This is the case of *Mayor &c. of Hoboken* v. *Hoboken Land and Improvement Company*, 7 Vroom, (36 N. J. Law,) 540. It was an action brought by the city to recover the filled-in portion of the street delineated on the Loss map as Fourth Street — that is, the portion between the water line as shown on the Loss map and the new water line made by filling in opposite the end of the street. The claim of the city to recover in that action is in all respects identical with its claims in the present suits. The following propositions were established by that case.

1. That the plaintiff may maintain these actions of ejectment for lands dedicated to public use as a street.

2. That no acceptance of a dedicated street, or actual user, is necessary to deprive the dedicating owner of his power of retraction, or to subject the dedicated land to the public use when it shall be required for such purpose.

3. That the streets delineated on the Loss map as extending to the Hudson River will be continued to the new water front made by the filling in by the Hoboken Land and Improvement Company, under its charter.

4. That an ordinance of the city adopting part of the street is no abandonment of the rest, and that the city authorities have no power, without legislative authority, to release the public right in a dedicated street.

5. Lapse of time, however long the public right in a street is suspended, though coupled with a user by the owner which would otherwise be adverse, will not make title by prescription against the public.

6. The powers of filling and reclamation conferred by the charter of the Hoboken Land and Improvement Company will not be construed to extinguish the public right to streets over such reclaimed land.

7. That under conditions above stated plaintiff could and did succeed in recovering for Fourth Street.

8. The public right to an easement of access to the navigable waters which existed when the Hoboken Company's charter was passed, was entirely distinct, in its essential qualities, from the title of the State in lands under tide-waters; the former inheres in the State in its sovereign capacity, the latter is strictly proprietary. A grant of the proprietary title would never operate as a release or extinguishment of a sovereign right, not necessarily included within the scope of the grant.

9. That with respect to lands over which streets have been laid, the ownership for all substantial purposes is in the public. Nothing remains in the original proprietor but the naked fee, which, on the assertion of the public right, is divested of all beneficial interest.

10. The public easement is legally consistent with title to the soil in a private owner, and the legislative intent to vest the proprietary title in defendants will have legal effect, without extinguishing the public right of access to the river derived from the original dedication.

11. When two public rights of different origin, distinct in

their nature and capable of a separate enjoyment, exist, a grant of the one will not extinguish the other, unless required by clear and unequivocal language. The cardinal rule of construction is the inquiry whether the legislative gift can take effect without drawing to it the additional right claimed. If it can, the latter is, by operation of law, excluded from the grant.

The above propositions are all extracted from the opinion in the previous case.

It is quite manifest that in so far as the present cases are identical with Fourth Street, they are controlled by the above case.

The defence to the present cases, if it is successful in any of them, must rest on some circumstances or conditions that were not in the Fourth Street case.

As to all points in which these cases coincide with Fourth Street, it is practically *res judicata* in the state court, and therefore in this court.

In addition to the authorities cited in the opinion above referred to, in support of the third of the above propositions, reference is also made to the following: *Lockwood* v. *New York & New Haven Railroad,* 37 Conn. 387; *Peck* v. *Providence Steam Engine Co.,* 8 R. I. 353; *Godfrey* v. *Alton,* 12 Illinois, 29; *S. C.* 52 Am. Dec. 476; *Rowan* v. *Portland,* 8 B. Mon. 232; *Wood* v. *San Francisco,* 4 California, 190; *Minor* v. *San Francisco,* 9 California, 39, 45; *Van Dolsen* v. *New York,* 17 Fed. Rep. 817; *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.,* 109 U. S. 672; *Barney* v. *Keokuk,* 94 U. S. 324; *Backus* v. *Detroit,* 49 Mich. 110; *Steers* v. *Brooklyn,* 101 N. Y. 51; *Ledyard* v. *Ten Eyck,* 36 Barb. 102.

The single exception from the rule that the federal courts are bound by the construction put by the highest court of a State on a state statute, is when such construction has deprived a suitor of the constitutional protection referred to. In no other case does this court entertain appeals from the decree of the highest court of a State in the construction of its laws. No such case is here. The fact that the controversy in these cases relates to land under tide-water in a public river

does not make the questions arising in them "federal questions," for it is well settled in this court, that the people of each State have acquired the absolute right to all the navigable waters and the soil under them. That right was not granted by the Constitution to the United States, but was reserved to the States respectively. *Barney* v. *Keokuk*, 94 U. S. 324, 333, and cases cited.

The plaintiffs in error therefore respectfully contend that in all the points in which the present cases are similar to the Fourth Street case, they must be controlled by the decision in that case, and the Circuit Court committed an error in disregarding or overruling it.

III. It remains to be considered what circumstances exist in the present cases, or any of them, which distinguish them from the Fourth Street case, and relieve them from the conclusive effect of that decision. This will require to some extent a separate consideration of each case.

(1) *River Street and Second Street.* — The Pennsylvania Railroad Company defends for these suits, and as its claim of title includes the land claimed in each of these suits, they may be considered together.

This claim, as before shown, is founded, first on a deed from The Hoboken Land and Improvement Company to the Camden & Amboy Railroad Company, dated December 1, 1864, and on a subsequent act of the legislature of New Jersey, passed March 31, 1869, conferring on the United Railway and Canal Companies of New Jersey, (the successors in title of the Camden & Amboy Railroad Company, and now succeeded by the Pennsylvania Railroad Company,) authority to reclaim and improve certain lands, and, when so reclaimed and improved, to possess and enjoy the same as owners thereof.

This act authorized the United Companies "to reclaim and erect wharves and other improvements *in front of any lands now owned by or in trust for them, or either of them,* or by any company in which they now hold the controlling interest, adjoining Kill von Kull, or any other tide-waters of the State, and, when so reclaimed and improved, to have, hold, possess and enjoy the same as owners thereof. *Provided,* That such

improvements shall be subject to the regulations (when appli-
cable) as to the line of solid filling and as to pier lines, hereto-
fore recommended in the report of the commissioners, made
and filed under the act, entitled ' An act to ascertain the rights
of the State and of riparian owners, in the lands lying under
the waters of the bay of New York and elsewhere in this
State,' approved April 11, 1864, but neither said improvements
nor those which may be made by said company in Harsimus
cove, shall be subject to any other restrictions than those
contained in said report."

It is claimed on behalf of the Pennsylvania Railroad Com-
pany that this act applies to the land described in the deed
from the Hoboken Land and Improvement Company to the
Camden and Amboy Railroad Company and that it operated
to release and discharge any land improved or acquired under
its authority, from all public easements which might hereto-
fore have existed on the land. There are two answers to this
claim.

*First.* The act could not apply to the land claimed in this
suit, because it was not owned by the companies named in this
act, nor by any of them, nor by any one in trust for them. It
was land under water which belonged to the State, as nothing
appears in the case to show that The Hoboken Land and Im-
provement Company ever acquired any title to it from the
State. It was held, by the Fourth Street case, that the grant
of power to purchase, fill up, and reclaim the lands of the
State was not a grant of the lands of the State. The same
has been repeatedly decided in New Jersey. *Hoboken* v. *Ho-
boken Land and Improvement Co.,* 7 Vroom, (36 N. J. Law,)
540 ; *Jersey City* v. *Morris Canal Co.,* 1 Beasley, (12 N. J.
Eq.,) 547, 551 ; *Morris Canal Co.* v. *Central Railroad Co.,* 1
C. E. Green, (16 N. J. Eq.,) 419, 431; *Stevens* v. *Paterson &
Newark Railroad Co.,* 5 Vroom, (34 N. J. Law,) 532, 534, 553 ;
*New York, Lake Erie, and Western Railroad* v. *Yard,* 14
Vroom, (43 N. J. Law,) 121 ; *S. C.* in Error, Ib. 632.

*Second.* If the act of 1869 shall be held to apply to, and
include the lands in question in this suit, it does not follow
that the streets running or entitled to run over such lands are
thereby vacated.

That grant of the power to reclaim and hold, does not vacate the streets, was expressly held in the Fourth Street case. If, therefore, the act of 1869 was intended to vacate streets, the intention must be found in the words, " but neither said improvements, nor those which may be made by said companies in Harsimus cove, shall be subject to *any other restrictions* than those contained in said (Riparian Commissioners') report." It is argued that the extension of streets over the reclaimed lands would subject its use to restrictions which were intended to be abolished by that language.

But no such result can follow such an enactment. It would be at variance with the most elementary and established rules as to the construction of grants by which public rights are dealt with. In fact, to give to this act of 1869 the construction claimed for it by the defendants, would render it of doubtful constitutionality.

The constitution of New Jersey (art. IV., sec. VII., § 4) contains the following provision : " To avoid improper influences which may result from intermixing in one and the same act, such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title."

In the case of the *Pennsylvania Railroad Co.* v. *National Railway Co.*, 8 C. E. Green, (23 N. J. Eq.,) 441, 455, the Court of Chancery of New Jersey, speaking of the constitutional provision above quoted, and of the things meant to be secured by it, said : " They are to prevent men from obtaining from the legislature the passage of acts without disclosing their real meaning and purpose; to protect a legislature from being misled by doubtful or ambiguous language; to permit nothing to be acquired from the public by covert and cunningly devised phrases; to compel those who ask for special privileges to say frankly and unmistakably what they mean, so that plain men cannot fail to understand what it is they are asked to vote away." There is not in the title of this act, or in the act itself, the remotest allusion to Hoboken or to any street in any city, nor does the power to improve lands mentioned in the title include the vacation of streets, much less is such an object ex-

pressed therein, and yet defendants would have the court decide that in the language there used the legislature intended to vote away the streets of the city of Hoboken. See also *Rader* v. *Union Township,* 10 Vroom, (39 N. J. Law,) 509, 512.

2. *River Street.* —The further grounds on which it is claimed that River Street is taken out of the rule established by the New Jersey court for Fourth Street, are: (*a*) That River Street approaches the water by a line parallel to the Hudson River and not at right angles thereto, and (*b*) that the right of extension rests upon the idea that where the street was dedicated to the water line, and a new water line is made by filling in, the street will be extended to such new water line because of the right acquired by the public, through the dedication, to go to the water, and that as the land in front of where River Street originally struck high-water mark, by the Loss map, has all been filled in, so that no extension of River Street can reach the water, without passing beyond the bounds of the territory included in the Loss map, and without going over lands granted by the State to the Delaware, Lackawanna and Western Railroad Company, the right to extend the street to tide-water has disappeared.

There certainly can be nothing in the point that the right of extension does not exist as to River Street because it strikes the water in a direction opposite to that of the other streets. The right of extension to navigable water has been established in regard to Hudson Street, in Jersey City, which was laid out by dedication, and precisely like River Street, in Hoboken, reached the water of Communipaw Bay, south of Jersey City, by a line parallel with the river, and at right angles to the streets which approach the river transversely.

But the further argument is that, as the right to go to tide-water by a street cannot now be enjoyed without extending the street beyond the bounds included in the original Loss map, and without crossing lands granted by the State to the Delaware, Lackawanna & Western Railroad Company, the right is gone. It is respectfully submitted that this objection is not open to and cannot avail the defendants in whose behalf it is set up. The reason why River Street as originally dedi-

cated cannot now get to tide-water on any part of the territory included within the Loss map, is because The Hoboken Land and Improvement Company have so filled up the bay or cove to which the street originally ran as to exclude the tide-water therefrom.

Such filling up, so far as it tended to prevent the street from reaching tide-water, was unlawful. The Court of Errors in the Fourth Street case made no exception founded on the direction in which the street approached the water. The principle laid down was that it was the access to the water that gave to the land on the street a peculiar value and gave the public a right to have the streets extended to the water.

If, then, the defendants have filled in at the end of River Street, a distance of one hundred feet, by a rule laid down in the Fourth Street case, that would *ipso facto* extend River Street over that filling in, and so far as the filling in was extended southerly the same result would follow. Each additional filling in would be an addition to or aggravation of what the court described as " a public nuisance."

It may be true, as found by the court, that in the present condition of affairs the street cannot now reach tide-water without going over land granted by the State to the Morris and Essex Railroad Company, but that is no reason why the street cannot be extended to tide-water, and if the defendants by their unlawful filling in in front of this street have rendered the access to tide-water more difficult and expensive than it otherwise would have been, that is no reason why their nuisance should be set up to prevent its getting to tide-water. The intervention of the land of the Morris and Essex Railroad Company at a point where the street can now reach tide-water does not deprive the city of the right to have it go there. There is nothing in the grant to the Morris and Essex Railroad Company, which would preclude the city from extending the street to or over its lands; *non constat*, but that the company would gladly have the street come to its lands. The fact of the existence of the Morris and Essex Railroad Company's piers and basins is no obstruction to the street. This precise point was passed upon by the Court of Errors in

the case of *Jersey City* v. *Morris Canal Company*, 1 Beasley, (12 N. J. Eq.,) 547. That was decided in 1859. In that case the court held that by dedicating the street to the water the public, represented by the city authorities, had the right to extend it to tide-water, and that the fact that the legislature had authorized the erection of a canal and basin between its original terminus at the shore and the new terminus at tide-water, could not prevent the city from extending the street across the canal basin to the new tide-water line ; and although in that case the basin, pier, and other works of the Morris Canal Company had been erected by competent and lawful authority, and occupied the place required for the extension of this street to the new tide-water line, the court held that, notwithstanding such obstruction, the common council had the right to carry the street to the water.

3. *Third Street.* — An attempt is made to withdraw Third Street from the operation of the decision of the Court of Errors in the Fourth Street case by reference to certain provisions of the charter of the city of Hoboken. Subdivision 7 of the 40th section of that charter confers upon the Common Council power to regulate and order the building of a dock at the foot of Third Street, in said city, at the expense of said city, such dock not to exceed in width the width of said street, and to regulate said dock and the use thereof when built, and the rates of wharfage, such wharfage to be received by said corporation for their use and benefit ; in connection with the 53d section of the same charter, by which it is enacted that the Common Council shall have power to take any land that they may adjudge necessary for the opening of Third Street, upon paying to the owner the fair value of the lands taken and of the improvements thereon, and the damage done to any distinct lot or parcel, or tenement, by taking part of it for such purpose, provided that the owners of property benefited thereby shall bear a just and equitable proportion of the expenses and costs of opening said street. The argument is, that these two sections are to be construed together, and that the power to open Third Street was in aid of the power to build the dock, and that the power to take lands by condem-

nation was an implied legislative admission that the street
could not be extended to the water without crossing lands
which would be required to be condemned and paid for.   To
this view there is a sufficient answer.

Third Street could be opened west much beyond the limit
of the dedication of the Loss map.   It is found as a fact in
the case that the territorial limits of Hoboken embrace a large
tract of real estate adjoining the land in the limit of the Loss
map on the west, which, of course, was not affected by the
dedication, so that the extension of Third Street westerly on
such additional land could only be accomplished by the city
acquiring in some way the right to the lands needed for such
extension.   This grant of power can, therefore, as well have
referred in the legislative mind to the extension of Third Street
west, as to the extension of Third Street to the river.   But
even if the legislature had by express terms conferred upon
the common council the power to condemn such lands as
might be necessary to extend Third Street from the original
shore line to the Hudson River, such grant of power could not
be held to be a legislative decision that such land could not be
taken without condemnation.   That was a question which the
legislature was not competent to decide.   It was a judicial
question, not a legislative one, and if there was even a doubt
in the legislative mind as to the power of the common council
to extend Third Street over reclaimed land to the water for
the purpose of building the dock, the power to condemn, if it
should be necessary, might well be conferred, without its
being tortured into a legislative declaration that the power
was necessary to be exercised in that particular case.

4. *Riparian Commissioners' Grants.* — The only remain-
ing circumstance which distinguishes any of the present cases
from the Fourth Street case, is the fact that some of the
defendants claim to have obtained grants for lands under
water, including the premises claimed in these suits, which,
being grants from the State, operated to vacate the streets or
to extinguish the public right to streets over the lands thus
granted.   These grants were made by the Riparian Commis-
sioners under the authority of the act of 1869, before referred

to, a copy of which is printed in the pamphlet annexed to the record. These grants being in the name and on the part of the State of New Jersey, by persons acting as agents for the State are subject to the same rule of construction which applies to grants made directly by the legislature, namely, that nothing passes by implication; in fact, a still more restrictive construction will apply to these grants because they are not made by the legislature, but in pursuance of power delegated by the legislature, and the act delegating the power to the Riparian Commissioners to make the grants does not authorize them to vacate that street. They have no authority whatever over the subject. The vacation or laying out of a street is a municipal or legislative act. The Riparian Commissioners deal only with the proprietary rights of the State, and have no jurisdiction whatever over any such question. *American Dock and Improvement Company* v. *Trustees of Public Schools*, 8 Stewart, (35 N. J. Eq.,) 281.

5. *Alluvion.* — The court below, in its fourth conclusion of law holds that the State has the right to fill in and make land as far as its ownership extends, and that the soil thus acquired was in no sense alluvion or accretion, which became the property of the shore owner, but remained the land of the State or its grantees, and that no right or authority existed in the shore owner, by dedicating to the public streets to the limits of her ownership, to charge such newly made land with the burden of an easement over it.

However correct the law as thus stated may be, it has no application to the facts of this case, for it is found as a fact that the filling and reclamation was done by the Hoboken Land and Improvement Company and their grantees, and that such land under water was in front of and adjoining the real estate purchased by that company.

We contend that when the reclamation is done by the shore owner the land reclaimed partakes of the nature of alluvion or accretion, and is assimilated in its title, estate and incidents to those of the land to which it became attached. *Jersey City* v. *Morris Canal Co., supra; Lockwood* v. *New York & New Haven Railroad Co.,* 37 Conn. 391; *Campbell* v. *Laclede Gas*

*Co.*, 84 Missouri, 352, 372; *Benson* v. *Moore*, 86 Missouri, 352; *Steers* v. *Brooklyn*, 51 N. Y. 51.

MR. JUSTICE MATTHEWS, after stating the case, delivered the opinion of the court.

In the year 1873 the Court of Errors and Appeals of New Jersey decided the case of the *Hoboken Land and Improvement Co.* v. *Hoboken*, 7 Vroom, (36 N. J. Law,) 540. It was an action of ejectment for the recovery of the possession of a strip of land, constituting the extension of Fourth Street, as laid out on the Loss map, over lands below the original high-water mark, reclaimed by the plaintiff in error in that suit, continued to the new water front. The unanimous judgment of that court affirmed the right of the city of Hoboken to the premises in dispute, being the extension of that street as a public highway. The foundation of that judgment is the dedication, according to the Loss map, of the streets delineated upon it as extending to the line of high-water mark at that date, and the nature of the title acquired by the Hoboken Land and Improvement Company, under the terms of their charter, act of February 21, 1838, to the land made by filling in, in front of the original high-water mark, upon and across which it was proposed to extend the street so as to secure access in behalf of the public to the stream of the river. It is argued that, as the present defendants claim title through the Hoboken Land and Improvement Company, to premises similarly situated and equally affected by the original dedication, the judgment of the Court of Errors and Appeals of New Jersey in that case conclusively establishes the law applicable to the present, and requires a reversal of the judgments of the Circuit Court of the United States.

It becomes necessary, therefore, at the outset, to ascertain and define the terms and scope of that judgment. In that case the court said (p. 546): "The title to the soil between the high-water line, as shown on Loss's map, and the present high-water line was originally in the State. It became the property of the defendants by reclamation under the powers

contained in their charter. The contention was that it was
not competent for Colonel Stevens to impress upon lands, the
property of the State, a servitude such as the plaintiffs are seek-
ing to have them appropriated to, and that when the defendants
acquired title under legislative permission, they were entitled
to hold such lands unimpaired by the servitude imposed upon
the upland. The first branch of this proposition is conceded.
But whether it will be available to his grantees to defeat the
present claim of the city will depend upon considerations inci-
dent to the nature and effect of the original dedication. The
street as dedicated extended to the high-water mark as it then
was. There is no street shown on the map or in fact along
the river in which Fourth Street might terminate. River
Street, which is the first street crossing Fourth Street parallel
with the river, is laid down on the map at a distance of about
seventy-five feet from the high-water line as it appears on the
Loss map. The location of Fourth Street with its terminus
at the water, demonstrates conclusively that its purpose was
to provide a means of access for the public to the navigable
waters, and such was the scope and purpose of the dedication."
The court then refers to the case of *New Orleans* v. *The
United States*, 10 Pet. 662, 717, as showing that, according
to the recognized law concerning dedications to public use, a
grant of land bounded on a stream which has gradually changed
its course by alluvial formations extends to the new bounda-
ries, including the accumulated soil, and that, on the same
principle, it had been held in that State in the case of *Jersey
City* v. *Morris Canal*, 1 Beasley, (12 N. J. Eq.,) 547, that a
dedicated street terminating at the waters of a navigable rive:
is continued to the new water front obtained by filling in in
front on the shore by the owner of the land over which the
street was dedicated; and to the same point the court cites
the cases of *The People* v. *Lambier*, 5 Denio, 9, and *Barclay*
v. *Howell's Lessees*, 6 Pet. 498. The learned judge, delivering
the opinion of the New Jersey Court of Errors and Appeals,
continues thus (p. 548): "In my judgment these cases de-
clare the law correctly on this subject. The essence of the
gift is the means of access to the public waters of the river,

the advantage of which induced the growth of the city by
reason of its adjacency and connection with the important
navigable waters of the Hudson, which gave a peculiar com-
mercial value to the lots put in the market by the dedication,
which can only be preserved by maintaining unbroken the
connection of the streets with the navigable river. Any ob-
structions of that access would not only derogate from the
effect of the gift, but would also be a public nuisance." Re-
ferring then to the title claimed by the Hoboken Land and
Improvement Company, adverse to the application of this
presumptive right growing out of the original dedication on
behalf of the public, the court say (p. 549): "The legislature
alone has the power to release the dedicated lands and dis-
charge the public servitude when it once has attached. Ex-
tinguishment by legislative action, it is insisted, has been ef-
fected as to a part of the premises in dispute by the fourth
section of the defendants' act of incorporation. The argument
was that the land below high water, being the property of
the State, and both the easement and the title being under
legislative control, the extinguishment of the former, by a
necessary implication, resulted from the grant of the latter.
I am unwilling to concur in this construction of the statute.
The grant to the defendants is not of lands of the State in
express and definite terms. The right conferred is a mere
privilege of reclamation and appropriation to private uses.
Its exercise is expressly limited to lands covered with water
in front of and adjoining lands that should be owned by the
corporation. The proviso annexed to the grant shows clearly
the legislative intent that the rights of others owning to the
water should not be interfered with without express consent."
Referring then to certain authorities as justifying this con-
struction, the opinion proceeds (p. 551): " It is not necessary
on the present occasion to express any opinion as to whether
the defendants could under their charter have filled in in front
of streets terminating at the water as against the public au-
thorities resisting the execution of the work. The cases above
cited are referred to to show the strictness of the construction
made of statutes granting privileges of this kind to private

persons. . . . The defendants' act of incorporation would probably relieve the defendants after the work was executed from the consequences of an unlawful encroachment on public lands in front of the streets, and of a nuisance in the obstruction of navigation; but it cannot affect the public easement of access to the navigable waters which existed before the act was passed. That public right is entirely distinct in its essential qualities from the title of the State in lands under tide-waters. The former inheres in the State in its sovereign capacity. The latter is strictly proprietary. A grant of the proprietary title will never operate as a release or extinguishment of a sovereign right not necessarily included within the scope of the grant. *The State, Morris Canal and Banking Company* v. *Haight,* 7 Vroom, (36 N. J. Law,) 471. The grant to the defendants comprised the valuable privilege of acquiring title to lands under tide-waters along their entire frontage on the river. The public easement is legally consistent with title to the soil in a private owner, and the legislative intent to vest the proprietary title in the defendants will have legal effect without extinguishing the public right of access to the river, derived from the original dedication. Where two public rights of different origin, distinct in their nature, and capable of separate enjoyment, exist, a grant of one will not extinguish the other unless required by clear and unequivocal language. The cardinal rule of construction is the inquiry whether the legislative gift can take effect without drawing to it the additional right claimed. If it can, the latter is by operation of law excluded from the grant. *Stevens* v. *Paterson and Newark Railroad Co.*, 5 Vroom, (34 N. J. Law,) 532. . . . The act incorporating the defendants contains no language indicative of an intent to extinguish the public right of access to the river, and the defendants hold the title acquired by legislative permission, subject to the obligation that resulted from the original dedication of permitting the connection of the street with the navigable waters to remain unbroken."

The two principal propositions established by this decision, so far as material to be considered in these cases, appear

by these extracts from the opinion, therefore, to be as follows: 1st, that the scope and purpose of the original dedication of the streets terminating at the water was to provide a means of access for the public to the navigable waters of the Hudson River; and, 2d, that the intent and purpose of this dedication were not defeated by the rights acquired by the Hoboken Land and Improvement Company, under the terms of its charter, to the lands in front of the streets terminating at the water as filled in by that company.

That company, it will be understood, had become the successor to the title of the original proprietor, Colonel John Stevens, to the lands owned by him embraced within the limits of the Loss map not previously sold. The object of its incorporation and its principal powers in respect thereto, are stated in the fourth section of its charter, as follows:

"SEC. 4. *And be it enacted,* That the said company be, and they are hereby, empowered to improve all such lands as they are hereby authorized to own or purchase, by laying out that portion of the same which lies north of Fourth Street, in the village of Hoboken, into lots, streets, squares, lanes, alleys, and other divisions; of levelling, raising, and grading the same, or making thereon all such wharves, workshops, factories, warehouses, stores, dwellings, and such other buildings and improvements as may be found or deemed necessary, ornamental, or convenient, and constructing on the lands of the said company aqueducts or reservoirs, for conveying, collecting, and providing pure and wholesome water; and letting, renting, leasing, mortgaging, selling, or changing the same, or using any lot or other portion of any of the said lands for depots, and for agricultural, mining, or manufacturing purposes; and they shall have power to purchase, fill up, occupy, possess, and enjoy all land covered with water fronting and adjoining the lands that may be owned by them; and they may construct thereon wharves, harbors, piers, and slips, and all other structures requisite or proper for commercial and shipping purposes; and when they shall have purchased the ferry right from the owners thereof they may enjoy the same, and purchase and build steamboats: *Provided,* it shall not be

lawful for the said company to fill up any such land covered with water, nor to.construct any dock, pier, or wharf immediately in front of the lands of any other person or persons owning down to the water, without the consent of such person or persons so owning, first had in writing and obtained."

Under this section it was that they proceeded to fill up, occupy, and improve the land covered with water fronting and adjoining the lands in the city of Hoboken which they had purchased, filling as they progressed in front of the several streets terminating on the river, as well as in front of the other lands which they had bought. They acquired no title to the lands reclaimed, except according to the terms of the permission granted in this section of the charter. The construction put upon this section by the New Jersey Court of Errors and Appeals was in substance that the license thereby granted to the company did not convey an unqualified title to the reclaimed lands in front of the streets, and therefore that the authority conferred by it was not intended to exclude the public right of access to the navigable water by an extension of the streets and highways laid out on the original land for that purpose.

It remains to be considered whether, consistently with that view of the law, the circumstances of the present cases distinguish them from the case decided, so as to justify us in affirming upon other grounds the judgments of the Circuit Court of the United States now under review.

It appears from the findings of fact that the several defendants in these causes are the assignees of the Hoboken Land and Improvement Company, and successors to that company in respect to the parcels of land sought to be recovered, of all its rights and title under its charter. The Hoboken Land and. Improvement Company conveyed the premises held by the Pennsylvania Railroad Company by a deed executed December 1, 1864, in consideration of $68,583.33, the grantee being the Camden and Amboy Railroad Company. On March 31, 1869, the legislature of New Jersey passed an act entitled "An act to enable the united companies to improve lands under water at Kill von Kull and other places." Laws 1869,

c. 386, p. 1026. This act recites that the united companies had recently secured to the State the payment of $500,000 "for the grant of lands under water in front of lands owned by them, and are desirous of having the right and privilege of erecting and making wharves, piers, and other improvements in front of other lands now owned by or in trust for them, so that they may safely make such improvements as they may find necessary to facilitate their business." It enacts "that the said united companies shall be, and they are hereby, authorized to reclaim and erect wharves and other improvements in front of any lands now owned by or in trust for them, or either of them, or by any company in which they now hold the controlling interest, adjoining Kill von Kull, or any other tide-waters of the State, and when so reclaimed and improved, to hold and possess and enjoy the same as owners thereof." It provides that such improvements shall be subject to the regulations, where applicable, as to the line of solid filling and as to pier lines heretofore recommended in the report of the commissioners made and filed under the act entitled "An act to ascertain the rights of the State and of the riparian owners in the lands lying under the waters of the bay of New York and elsewhere in the State," approved April 11, 1864, Laws of 1864, p. 681; but "neither said improvements, nor those which may be made by said companies in Harsimus Cove, shall be subject to any other restrictions than those contained in said report." It was further provided that the united companies should pay the further sum of $20,000 in full satisfaction for the right and privilege thereby granted, and that they should, on or before July 1, file in the office of the Secretary of State a map and description of the lands under water in front of the upland referred to in the section.

On the same day on which this act was passed and took effect, March 31, 1869, the legislature of New Jersey passed an act entitled a "Supplement to an act entitled 'An act to ascertain the rights of the State, and of riparian owners in the lands lying under the waters of the Bay of New York and elsewhere in this State,' approved April 11, 1864." Laws of 1869, p. 1017; Revision 1877, p. 982. By this act it was pro-

vided that the bulkhead line or lines of solid filling, and the pier lines in the tide-waters of the Hudson River, New York Bay, and Kill von Kull, lying between Enyard's dock, on the Kill von Kull, and the New York State line, so far as they had been recommended and reported to the legislature by the commissioners appointed under the original act, were adopted and declared to be fixed and established as the exterior bulkhead and pier lines between the points above named, as shown upon the maps accompanying the reports of the commissioners and filed in the office of the Secretary of State. The act made it unlawful to extend any structures into the river beyond these lines. It repealed an act approved March 18, 1851, the object of which was to authorize the owners of lands upon tide-waters to build wharves in front of the same, so far as the tide-waters of the Hudson River, New York Bay, and Kill von Kull were concerned, providing that said repeal "shall not be construed to restore any supposed usage, right, custom, or local common law, founded upon the tacit consent of the State, or otherwise, to fill in any land under water below mean high tide;" and it prohibited any person from filling in, building on, or making any erection on, or reclaiming any land under the tide-waters of the State in New York Bay, Hudson River, or Kill von Kull without the grant or permission of the commissioners. This, the third section of the act, however, contained the following proviso : "Provided, however, that neither this section, nor any provision in this act contained, shall in any wise repeal or impair any grant of land under water, or right to reclaim made directly by legislative act, or grant, or license, power or authority, so made or given, to purchase, fill up, occupy, possess and enjoy lands covered with water fronting and adjoining lands owned, or authorized to be owned, by the corporation, or grantee, or licensee, in the legislative act mentioned, its, his or their representatives, grantee or assigns, or to repeal or impair any grant or license, power or authority to erect or build docks, wharves and piers opposite and adjoining land owned or authorized to be owned by the corporation, or grantee, or licensee, in the legislative act mentioned, its, his or their representatives, grantees or assigns, heretofore made or

given directly by legislative act, whether said acts are or are not repealable, and as to any revocable license given by the board of chosen freeholders of a county to build docks, wharves or piers, or to fill in or reclaim any lands under water in the said New York Bay, Hudson River or Kill von Kull, the same shall be irrevocable, so far as thē land under water has been reclaimed or built upon under such license at the time that this act takes effect."

The fourth section of the act provides that in case any person, who by any legislative act is a grantee or licensee, or has any such power or authority, shall be entitled to a deed in the name of the State of New Jersey conveying the land in the proviso to the third section mentioned, whether under water at that time or not, with the benefit of an express covenant that the State would not make or give any grant or license, power or authority affecting lands under water in front of said lands; and the commissioners, or any two of them, with the Governor and Attorney General for the time being, were authorized to execute and deliver, and acknowledge, in the name of the State, a lease in perpetuity to such grantee or licensee of such lands and rights, reserving an annual rental of three dollars for each lineal foot measuring on the bulkhead line, or a conveyance in fee upon the payment of fifty dollars for each lineal foot measuring on the bulkhead line in front of the land included in said conveyance. It was also provided that "the conveyance or lease of the commissioners under this or any other section of this act shall not merely pass the title to the land therein described, but the right of the grantee or licensee, individual or corporation, his, her or their heirs and assigns, to exclude to the exterior bulkhead line the tide-water, by filling in or otherwise improving the same, and to appropriate the land to exclusive private uses, and so far as the upland, from time to time made, shall adjoin the navigable water, the said conveyance or lease shall vest in the grantee or licensee, individual or corporation, and their heirs and assigns, the rights to the perquisites of wharfage, and other like profits, tolls and charges."

Under the provisions of said act, the State of New Jersey,

according to the findings of fact, for a valuable consideration, has conveyed to the Hoboken Land and Improvement Company, by deeds and conveyances properly executed, or to its assigns, the premises claimed in the several suits against the defendants other than the Pennsylvania Railroad Company.

An objection is taken in argument to the validity, under the Constitution of New Jersey, of the act to enable the united companies to improve land under water at Kill von Kull and other places of March 31, 1869, under which the Pennsylvania Railroad Company claims title, on the ground that the title of the act does not sufficiently indicate its subject and that the subject is not single. The article of the state constitution to which this act is alleged to be repugnant is article 4, section 7, paragraph 4, as follows: " To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title." We cannot think, however, that this objection is well founded. The subject of the enactment is single; the united companies, it being recited, having paid $500,000 for the grant of lands under water in front of lands owned by them, were desirous of having the right and privilege of erecting and making wharves, piers, and other improvements in front of other lands now owned by or in trust for them, so that they might safely make such improvements as they might find necessary to facilitate their business. This is the declared purpose of the act. It has and professes to have but a single object; this was to confirm the title of the united companies to the lands described, and to define the uses to which they were subject, and to which they might lawfully be devoted. The subject matter of the legislation was the interest of the united companies in respect to such land wherever situated. For the right conveyed by the new act, a further consideration of $20,000 was exacted and paid, and it was certainly appropriate that, in the same act requiring that consideration to be paid, there should be a full statement of all the rights intended to be secured. The statute, therefore, is unobjectionable in point of form.

It is next objected that this act of 1869 can have no application to the lands in question, because by its terms it applies only to lands under water in front of upland owned by the grantees, and that it did not appear that at that time the united companies owned any upland which these lands were in front of. We cannot doubt, however, that the land in question refers to and embraces the premises in controversy. It expressly refers to all lands owned by the united companies adjoining any of the tide-waters of the State, and undoubtedly had in view the lands conveyed by the Hoboken Land and Improvement Company by the deed of December 1, 1864. These they were authorized to reclaim, so far as necessary, by filling out to the lines fixed by the commissioners under the act of April 11, 1864, as lines of solid filling and as pier lines, upon which they were authorized to erect wharves and other improvements, and when so reclaimed and improved to have, hold, possess and enjoy the same as owners thereof, and so absolutely such owners as that the improvements should not be subject to any other restrictions than those contained in the report of the commissioners. Under this act, having paid the consideration required, they filed the map and the description of the lands specified in the last proviso of the section, and the findings of the Circuit Court authorize us to assume that this map and description embraced the premises in controversy.

In the examination of the effect to be given to the riparian laws of the State of New Jersey by the act of April 11, 1864, in connection with the supplementary act of March 31, 1869, it is to be borne in mind that the lands below high-water mark, constituting the shores and submerged lands of the navigable waters of the State, were, according to its laws, the property of the State as sovereign. Over these lands it had absolute and exclusive dominion, including the right to appropriate them to such uses as might best serve its views of the public interest, subject to the power conferred by the Constitution upon Congress to regulate foreign and interstate commerce. The object of the legislation in question was evidently to define the relative rights of the State, representing the public sovereignty and interest, and of the owners of land bounded

by high-water mark. The regulations to this end had in view a definite and permanent demarcation of the line in the water, beyond which there should be no obstructions or impediments to the public right of navigation; they also contemplated, as of equal importance, the manner in which and the persons by whom the intermediate space between those exterior lines and the original high-water mark should be filled up, reclaimed, occupied, and used, so as to make the enjoyment of such property most valuable to private and public interests involved in the public right of navigating the water. It was for this reason that this space was made the subject of grants by the State to corporations and other persons who were riparian owners adjacent thereto, with authority to erect or build thereon docks, wharves, and piers; and that prior grants of a similar character under legislative authority, even although in the form of mere executed licenses, were confirmed and perpetuated. It was for that reason that in the grant to the united companies this right and privilege of erecting and making wharves, piers, and other improvements was declared to be "so that they may safely make such improvements as they may find necessary to facilitate their business." For the same reason it was declared in the act of March 31, 1869, that the conveyance or lease of the commissioners under the act should not merely pass the title to the land therein described, but the right to reclaim and fill in and otherwise improve the same, and "to appropriate the land to exclusive private uses." In view of the same policy it was that by the same act, in reference to land under water which had not been improved, and in respect to which no authority or license to reclaim the same had been previously granted, it was provided that the grant from the State should be offered first to the riparian proprietor, and if after six months' notice he declined to buy the same from the State at its statutory price, the commissioners were authorized to grant the same to others having no riparian ownership, on condition, however, that the interest of the riparian owner as such in the shore and front of his land thus to be taken from his use should be paid for at a valuation to be judicially ascertained. The intent of this legislation is, there-

fore, manifest to treat the title and interest of the State in these shore lands as a distinct and separate estate, to be dealt with and disposed of in accordance with the terms of the statutes; first, by a sale and conveyance to the riparian owner himself, or to his assignees; and, second, in case of his neglect to take from the State its grant on the terms offered, then to a stranger, who, succeeding to the State's title, would have no relation to the adjacent riparian owner, except that of a common boundary. The title acquired by such a grantee, therefore, differs in every respect from that of a riparian owner to the alluvial accretions made by the changes in a shifting stream which constitutes the boundary of his possessions. The latter comes to him by virtue of his title to land bounded by a stream, and belongs to him because it is within the description of his original grant; but the title under the New Jersey grants is not only of a new estate, but in a new subject divided from the upland or riparian property by a fixed and permanent boundary.

The nature of the title in the State to lands under tide-water was thoroughly considered by the Court of Errors and Appeals of New Jersey in the case of *Stevens* v. *Paterson and Newark Railroad Co.*, 5 Vroom, (34 N. J. Law,) 532. It was there declared (p. 549): "That all navigable waters within the territorial limits of the State, and the soil under such waters, belong in actual propriety to the public; that the riparian owner by the common law has no peculiar rights in this public domain as incidents of his estate, and that the privileges he possesses by the local custom, or by force of the wharf act, to acquire such rights, can, before possession has been taken, be regulated or revoked at the will of the legislature. The result is that there is no legal obstacle to a grant by the legislature to the defendants of that part of the property of the public which lies in front of the lands of the plaintiff, and which is below high-water mark."

It was, therefore, held in that case, that it was competent for the legislative power of the State to grant to a stranger lands constituting the shore of a navigable river under tide-water, below the high-water mark, to be occupied and used

with structures and improvements in such a manner as to cut off the access of the riparian owner from his land to the water, and that without making compensation to him for such loss. The act of March 31, 1869, as we have seen, afterward secured to the riparian owner the option of purchasing from the State its title to the shore, or, if granted to a stranger, compensation for the value of his privilege.

Having in view the manifest policy of this legislation, and the force and meaning of its language, we do not hesitate to adopt the conclusion that the several grants of the State to the united companies, under the act of March 31, 1869, to enable them to improve their lands under water at Kill von Kull and other places, and the grants under the general act of the same date, under which the other defendants claim, were intended to secure to the grantees the whole beneficial interest and estate in the property described, for their exclusive use for the purposes expressed and intended in the grants. And, construing these conveyances most strongly in favor of the public, and yet so as not to defeat the grants themselves, we also conclude that the rights conveyed exclude every right of use or occupancy on the part of the public in the land itself. The land granted is specifically described by metes and bounds. The grant is a grant of the estate in the land, and not of a mere franchise or incorporeal hereditament. The uses declared are such as require an exclusive possession by the grantees, that they may hold, possess, improve, and use the same for their own use and profit, according to the nature of the business which by law they are authorized to conduct. In other words, under these grants the land conveyed is held by the grantees on the same terms on which all other lands are held by private persons under absolute titles; and every previous right of the State of New Jersey therein, whether proprietary or sovereign, is transferred or extinguished, except such sovereign rights as the State may lawfully exercise over all other private property.

It is further objected, however, that upon this supposition that the grants of the State in question are absolute and unqualified, nevertheless they operated only upon the title

which the State had when it made them; and that, construing the original dedication of Stevens by the Loss map of the streets to the river as containing an implied covenant that they should be extended through any after-acquired lands thereafter owned by Stevens or by those claiming under him, the conclusion follows that the defendants, on acquiring the title of the State to the premises in dispute, were thereafter estopped to deny the right of the city of Hoboken to the easement which it seeks to establish by its recovery in these actions. It is admitted in the argument by counsel for the plaintiff, that the dedication could not impose a burden on the lands of the State, and that no such burden existed as long as the State remained the owner; but it is contended that, as the grants of the State only operated on its present title, that "when the State's title passed to the successor of John Stevens, who was estopped from excluding these streets from access to tide-water, the right as against him by estoppel sprang at once into existence and estopped him and all claiming under him." Suppose, instead of a dedication, it is said, John Stevens had made an express covenant with the city, that, as he acquired the State's title to these lands and reclaimed them, he would continue the streets to the new water-line. In such case no one would contend that the riparian acts, or the grants made under them, would discharge such liability; it would attach to the lands as he acquired them, and bind him and his assigns. The dedication operates, it is claimed, on the same principle. No grant of the State's title would extinguish a liability which could not attach until after the State had parted with all its title to the lands.

But in this case there was no express covenant, and if any to that effect can be implied by law, it arises only upon the principle of an estoppel. Whether such an estoppel would arise upon the circumstances of the case, it is not necessary for us to discuss or decide. If we suppose it to exist, so that if the title acquired by the defendants from the State had been acquired from some other source, it would have been affected by it; nevertheless, the estoppel cannot apply to the defendants as successors to the title of the State. The grant, being

from the State, creates an estoppel against the estoppel; for the State, in respect to the easements claimed, is the representative of the public, superior in authority and paramount in right to the city of Hoboken ; and, as we have already seen, the existence of the easement defeats the grant of the State. The State, therefore, being estopped by its grant is estopped to deny its effect to extinguish the public right to the easement claimed. The right insisted upon in these actions by the city of Hoboken is the public right, and not the right of individual citizens, claiming by virtue of conveyances of lots abutting on streets made by Stevens or his successors in the title. The public right represented by the plaintiff is subordinate to the State, and subject to its control. The State may release the obligation to the public, may discharge the land of the burden of the easement, and extinguish the public right to its enjoyment. Whatever it may do in that behalf conclusively binds the local authorities, when, as in the present cases, the rights of action asserted are based exclusively on the public right.

The extension of the easement of the public streets over the shore, when filled up below the original high-water mark to a new water-line, is, by the supposition made, a mere legal conclusion. The original proprietor had no power to extend the dedication beyond his own lines over the public domain. The estoppel sought to be raised against him by his subsequent acquisition of the title of the State to the shore is a mere conclusion of law, and may be extinguished by a subsequent law. Such is the present case. If the law prior to the statutes of March 31, 1869, extended the easements of the dedicated streets to the newly made shore line, a subsequent law might extinguish it. This is what in fact was done, for the statutes of that date were not merely grants of rights of property, but were laws, which had the force of repealing all prior laws inconsistent with them.

Our conclusion, therefore, is that the grants from the State of New Jersey, under which the defendants claim, respectively, are a complete bar to the recovery sought against them in these suits. The effect of these grants was not considered or determined by the Court of Errors and Appeals of New Jer-

sey in the case of the *Hoboken Land and Improvement Company* v. *Hoboken*, 7 Vroom, 540, and they were not elements in that judgment. The present cases are decided upon the distinction created by these grants from the State. It has not been necessary, therefore, for us to consider other questions raised in the argument in reference to the soundness in point of law of the judgment of the courts of New Jersey upon the facts involved, nor as to our obligation to follow that judgment as conclusive evidence of the settled law of the State on the subject. The new elements which have been introduced into these cases establish the rights of the defendants, as we have declared them, upon the basis of the absolute and unqualified title derived by them under direct grants from the State of New Jersey. Under these grants they have and hold the rightful and exclusive possession of the premises in controversy against the adverse claim of the plaintiff to any easement or right of way upon and over them, by virtue of the original dedication of the streets to high-water mark on the Loss map.

The several judgments of the Circuit Court in these cases are, therefore,

*Affirmed.*