| 63 | 45 |
| e63 | 664 |

The Morris and Essex Railroad Company and The Dela-
ware, Lackawanna and Western Railway Company

*v.*

The Mayor and Common Council, &c., of Jersey City,
The Board of Street and Water Commissioners of
Jersey City and The Jersey City Electric Light
Company.

[Submitted January 15th, 1902. Decided February 20th, 1902.
Filed April 23d, 1902.]

1. The act of April 6th, 1871 (*Gen. Stat. p. 2796*), entitled "An act rela-
tive to the riparian commission," provided that the riparian commissioners
might, by lease or grant, dispose of lands under tide water, or which
had been formerly thereunder. The board of riparian commissioners was
created by the act of April 11th, 1864 (*Gen. Stat. p. 2785*), entitled "An
act to ascertain the rights of the state and of the riparian .owners in the
lands lying under the waters of the bay of New York and elsewhere in
the state." This act was followed by several supplemental acts relating
·to the same subject. Under authority of these acts the riparian commis-
sioners granted to complainant's predecessor in title certain land then and
which had formerly been under tide water, together with "all the rights
of the state in such lands." This land extended across the original water-
front termination of one of defendant city's streets.—*Held*, that the grant
was sufficient to extinguish any highway rights which the public may have
acquired in the land conveyed by acts of dedication by the former owners
thereof or otherwise, and hence defendant's street ended at the original
high-water line.

2. The act of April 6th, 1871, being an independent act, and hence not
restricted by the title of the act of 1864, its title is sufficiently broad to
include the powers of the commissioners to make the grant in question, so
as to relieve the act from any constitutional objection on this ground.

3. The fact that at the time of the grant the grantees, who were the
owners of the shore, had filled in and reclaimed the land in question, and
thus acquired a common law title thereto, and that their charter contained
a special legislative grant thereof, did not limit the public rights released
by the grant to merely riparian rights, but the grant, being absolute, re-
leased all the rights of the public of every nature whatsoever.

4. The fact that the grant was originally only a lease, with right to an
absolute conveyance upon payment of the purchase-price, and that after

Morris & Essex R. R. Co. *v.* Jersey City.

such lease the grantees did not close the alleged highway, but allowed it to be used by the public for ten years, until the absolute grant was made, did not limit the release of rights contained in the absolute grant merely to the rents reserved in the lease, or in any way curtail the extent of the release, especially in view of the fact that no material change took place in the condition of the land, and no private rights intervened between the two grants.

5. In a suit to enjoin a city from interfering with complainant's use and possession of certain land which had formerly been under tide water, and which extended across the original water-front termination of one of defendant's streets, defendant claimed the right to extend such street over the land by virtue of acts of dedication by former owners of such land. Evidence considered, and held to show no such dedication or acceptance as gave the city any right to so extend its street.

6. Where maps of lands situated on a tide-water river, made for the purpose of constructing sewers and water works, &c., for a prospective city, showed the streets therein laid out as extending across the waters of the river, but the maps were not recognized or authorized by the riparian landowners, there was no act of dedication which would give the city the right to extend such streets over lands reclaimed from tide water by the riparian owners.

7. Where a city extended a sewer through land subsequently claimed as a street, and made an assessment for such extension on the basis of building lots laid out on the land on each side of the strip through which the sewer ran, payment of the assessment by the owner of the land was not evidence that he knew or approved of the basis of the assessment, so as to constitute such payment an act of dedication of the land traversed by the sewer.

8. Where the owners of a dock in a tide-water river between two cities constructed a road or causeway through the water, connecting their dock with their warehouse and also with the water terminus of a public street, but the causeway was never extended across the river so as to connect with any street in the opposite city, no ferry was ever established from the end of such causeway across the river, and it was never worked as a street by the city, and was never open to the general public, although many people used it as a street, there was no such dedication as would give the city the right to treat the causeway as an extension of its street.

On final hearing on bill, answer and proofs taken before a master.

*Mr. Flavel McGee,* for the complainants.

*Mr. John W. Queen* and *Mr. Allan L. McDermott,* for the defendants.

PITNEY, V. C.

The complainant the Morris and Essex Railroad Company is the owner, and the complainant the Delaware, Lackawanna and Western Railway Company is the lessee in possession of certain lands within the corporate limits of Jersey City, which it is using for railroad purposes.

The defendant the city of Jersey City claims that it has the right to take possession of a certain portion of this land by reason of its being in law, if not in fact, a public highway.

In the month of March, 1898, certain employes of the defendant the electric light company, acting under the authority of the municipal government, entered upon the portion of the land above mentioned and made excavations for the purpose of erecting, and did erect, poles thereon to sustain wires to be used to conduct a current of electricity to be utilized for producing street lights.

Thereupon the complainants filed their bill in this cause seeking to restrain such action, and an injunction was thereupon granted by the late chancellor.

The city alone answered; issue was joined, and a large mass of testimony taken before a master, and the cause brought to hearing thereon.

The reason set forth in the bill for coming into this court is that the acts threatened by the city will amount to a taking of the complainants' property without making or proposing to make compensation therefor, and, besides, will work irreparable injury in seriously obstructing the legitimate operations of complainants' railroads.

No objection was taken to the jurisdiction, either in the answer or in the argument.

It is admitted that the *locus in quo* was once covered by the waters of the Hudson river at high tide, and hence was the property of the state, and that the Morris and Essex Railroad Company is now the owner thereof in fee-simple, and that the Delaware, Lackawanna and Western Railway Company is the lessee in possession, both holding, however, subject to the right, if any, therein of the public for the purpose of a street or highway.

The city contends that the *locus in quo* is a part of Thirteenth street, formerly North Fifth street, in that city.

This contention is based upon acts alleged to be acts of dedication by former owners, through whom the complainants derived title, and not upon any legal proceedings taken to lay out a street and acquire the right as against the owners, nor upon a formal or actual acceptance of a dedication followed by a working and grading thereof.

The complainants, first, deny the acts relied upon to effect a dedication, and contend, as a matter of law, that no dedication ever did result from such acts as are proven.

Second, they set up a conveyance and release from the state of any rights which the public may have acquired therein.

This release is in the form of two grants by the governor and the riparian commissioners to the Jersey Shore Improvement Company, a former owner of the premises, made under the act of April 6th, 1871 (*P. L. of 1871 p. 113; Rev. of 1877 p. 988; Gen. Stat. p. 2796*), and the several acts which preceded it, known as the riparian acts.

In support of this contention they rely upon the case of *City of Elizabeth* v. *Central Railroad Co., 24 Vr. 491,* which followed the decision in the several cases known as the Hoboken cases, made by the United States supreme court and reported in *124 U. S. 656.*

In reply to these positions it was contended, in an elaborate argument by counsel for defendants—*first,* that the whole of that part of the legislation found in the several acts above referred to authorizing grants by the riparian commissioners is unconstitutional, because not within the purview of the title of the original act of April 11th, 1864 (*P. L. of 1864 p. 681; Rev. of 1877 p. 980; Gen. Stat. p. 2784*) ; *second,* that the decision of the United States supreme court in the Hoboken cases was unsound in that it did not follow the decision of the court of errors and appeals of New Jersey in the case of *Hoboken Land and Improvement Co.* v. *Hoboken, 7 Vr. 540,* and that the last-named case, notwithstanding the decision of the United States supreme court, governs the present case; *third,* that the decision of the United States supreme court does not support the

decision of the supreme court of this state in *Elizabeth* v. *Central Railroad Co., supra.*

With regard to this line of argument I have to say that, sitting in this court, I am bound to accept the law as laid down by the supreme court of this state until that shall be overruled or modified by the court of errors and appeals.

The able, ingenious and elaborate argument addressed to me to induce me to decline to follow *Elizabeth* v. *Central Railroad Co.,* will be properly addressed to the court of errors and appeals.

With regard, however, to the constitutional question, which is based upon the lack of scope of the title of the act of April 11th, 1864, it is to be observed that the riparian grant, under which the complainants in this case claim, was made under the act of April 6th, 1871. *P. L. of 1871 p. 113; Rev. of 1877 p. 988; Gen. Stat. p. 2796.* The title of that act is as follows: "An act relative to the riparian commission." In this it varies from the several supplements to the act of 1864, most important of which was the act of March 21st, 1869. *P. L. of 1869 p. 1017; Rev. of 1877 p. 982; Gen. Stat. p. 2786.* These, by their terms, were mere supplements to the original act, and therefore confined in their scope by the title of that act; while the act of April 6th, 1871, is an independent act, and its title is sufficiently broad, as it seems to me, to include the power to make the grant in question. At the time of its passage the riparian commission was an established institution in the State of New Jersey.

Another point made by the defendants, and, as I understand the argument, the principal one relied upon by their counsel to affect the mind of this court, is that prior to the riparian grants under which the defendants claim, the grantees thereof, who were the owners of the shore, had filled in and reclaimed the *locus in quo,* and by such reclamation had acquired a complete and perfect title thereto, first, under the local common law which was declared and settled in the case of *Gough* v. *Bell, 3 Zab. 624,* and second, by virtue of a special legislative grant contained in the charter of the Jersey Shore Improvement Company substantially, if not precisely similar to that made to the Hoboken Land and Improvement Company, and which was drawn in question in

the case of *Hoboken* v. *Hoboken Land and Improvement Co.,* *supra;* and because they, the grantees, were the absolute owners of the *locus in quo,* the state had no interest therein of a riparian nature to grant, and hence the grant of the riparian commissioners cannot be construed as releasing any public rights of way in that part so reclaimed which at that time belonged to the public.

But I find, upon looking at the printed books in the Hoboken cases, reported in *124 U. S.,* that one of the grants there brought in question was made by the state to the Hoboken Land and Improvement Company, and purported to grant, convey and confirm unto the said Hoboken Land and Improvement Company

"so much of the land and premises above described *as may have been originally below* the line of high-water mark, and all lands under water in front of the lands above described," &c.,

with this additional verbiage—

"that is to say, all the lands *now or formerly* under water in the Hudson river below the present or any former line in high-water mark which are comprised within the following metes and bounds."

It thus appears that one of the grants dealt with by the United States supreme court in the cases mentioned was a grant expressly of lands which had once been covered by water, but which were reclaimed before the grant was made to the Hoboken Land and Improvement Company. And, as I understand the situation in that case, the United States supreme court held that the riparian grant there in question was sufficient to extinguish the right of highway over this land which was vested in the public at the time the grant was made.

The riparian grant so dealt with was made in 1869, under the act of that year and prior to the passage of the act of April 6th, 1871, which first expressly provided for grants of land which had formerly been under water, but had been reclaimed.

The grant brought in question and sustained in *Elizabeth* v. *Central Railroad Co., supra,* was made after the passage of the

act of April 6th, 1871, and covered land which had been re-claimed and actually used as a highway for many years. And this peculiarity was in the mind of the court in *Elizabeth* v. *Central Railroad Co.,* as appears by what was said at *p. 497.*

There the point was taken that the state itself was the owner of the *ripa* in that case, because it was the owner of the bed of the highway in front of which the defendants claimed that the grant took effect.

The learned judge concludes his opinion in this wise: "The grant is made in absolute terms, *independent of any riparian title,* and without reference to any particular statute; consequently it must be deemed as comprehensive as the law permitted. That the state may not defeat or impair its absolute grants, made under these riparian statutes, because of the public right to a highway on the *ripa,* is one of the points decided in *124 U. S. 656;* and although doubts may have been previously expressed concerning it in the state courts, yet now due regard for uniformity of decision, upon a question affecting so many important titles in the hands of citizens of other states, as well as of our own, constrains us to follow the federal adjudication."

This remark is most significant as applied to the present case. Here the action, if maintainable at all, might have been maintained in the federal court by the Delaware, Lackawanna and Western Railway Company alone, as lessee of the Morris and Essex railroad. And if it had been so brought, there can be no doubt that the federal court would have taken the same view previously taken. Ought it to make the least difference in the result that the suit is brought in this court? I think not.

But the defendant takes a still further point which he insists is not covered by any of these decisions, and arises out of circumstances peculiar to this case. Those circumstances are the following:

The first grant under which complainants claim was dated December 22d, 1871, but not recorded until 1876. I shall assume that it took effect from its date. It is, in form, a grant and lease, and reserves a yearly rent of $2,760.33, and contains a covenant for a further grant upon payment of a specified

sum. It refers to the several riparian acts, and recites that of April 6th, 1871, and states that part of the lands to be conveyed were formerly, but not then, under tide water, and proceeds to grant as follows:

"The said party of the first part doth hereby grant, bargain, sell, convey and let unto the said party of the second part and to its sucessors forever," &c.

Then follows a description of the land and mention of the privileges to be granted, then a reservation of the rent, and then this covenant:

"And the said state doth hereby expressly covenant and agree that a conveyance to the party of the second part, its successors and assigns, in fee shall be made by the said state of and for any part of the said lands and benefits hereby granted free and discharged of the whole or of an equitable portion of the said rent on its paying to the said state the sum of $39,433.33, or an equitable proportion of that sum, according to the quantity and value of the land desired to be discharged from the said rent or a portion thereof."

The second grant was made in pursuance of this covenant, and is dated July 1st, 1881, and recorded November 12th, 1881. It recites the riparian rights and the previous grant, and then, in consideration of $39,433.33, it grants as follows:

"Doth hereby grant, bargain, sell, quit claim and convey unto the said The Jersey Shore Improvement Company and to its successors and assigns forever," &c.

And, after describing the property, contains the following:

"Together with all and singular the hereditaments and appurtenances thereunto belonging, *and all the rights of the state in said lands.* To take, to have, to use, exercise and enjoy and to hold the said lands and premises to the use of the said party of the second part, their successors and assigns forever."

This language is sufficiently clear and conclusive, and by its terms includes all rights of highway in the premises then held by the public.

Now, the contention of the defendant is, that prior to the

grant of 1871, the *locus* in question had been dedicated to the public as a highway, and, conceding that the right of the public under such dedication had been extinguished by that grant, yet that the Jersey Shore Improvement Company, the grantee, who then and until 1881 were the owners of the land, did not act under that grant by closing the highway, but continued to permit it to be used thereafter as before, and ratified the previous dedication, so that at the date of the second grant in 1881 it was a well recognized public highway open to use by all citizens; and the argument is that the grant of 1881 must be construed to be nothing more than a release of the rent reserved by the grant of 1871, and cannot be construed to release any right which the public had in the meantime acquired. This peculiarity, it is argued, differentiates this case from that of *Elizabeth* v. *Central Railroad Co., supra.* I think that the present case is measurably different from that dealt with in the case last mentioned. Nevertheless, I think it is clearly within the principle enunciated by Mr. Justice Dixon in speaking for the supreme court in that case in the language above cited.

But, says counsel for defendant, the principle thus cited would carry us altogether too far; the spirit of the statute is that at any time—ten, twenty or fifty years—after the original grant reserving rent is made, the grantee may apply to the state, and, *ex debito justitiæ,* be entitled to a release of the rent upon payment of the principal sum mentioned; and suppose in the meantime a town·had been built up, streets laid out and· improved and built upon, is it possible that the second grant would vacate all those streets? This argument is not without force. But, granting all that the defendant claims, the present is no such case. It is not proved, or even contended by the defendant, that any material change took place in the condition or use of the land between the two grants, or that any private rights intervened. Besides, the complainant the Morris and Essex Railroad Company purchased from the Jersey Shore Improvement Company on the strength of the last grant.

By the rule laid down in *Elizabeth* v. *Central Railroad Co.,* whatever right of highway the state possessed in that causeway was extinguished by the last riparian grant.

I may add that it is not surprising that the courts have given those grants so great value. They are made with great care and caution by trusted public servants, after a full moneyed consideration paid to the state. They are signed by the governor and by the attorney-general, under the great seal of the state, and in addition thereto have the signatures of the riparian commissioners. If it be possible to guard the state against imposition and fraud, it is accomplished by the safeguards thrown around these grants. And here the language of the court in *Elizabeth* v. *Central Railroad Co.*, above cited, is significant, and it seems to me that it covers the present case.

For myself I can see no reason why such a grant should not be subject to the ordinary rules of construction applied to contracts between individuals, and, bearing in mind that it is dealing with lands which were once under water, and so within the scope of the riparian acts, such construction will include in the grant the right of the public in all highways. That is the result of the use of the words "all the rights of the state in said lands."

But as the issue of dedication or no dedication is raised by the pleadings and an immense amount of testimony has been taken upon that subject and it has been debated at great length by eminent counsel, and another court may take a different view of the law of the case, I have deemed it my duty to go through the evidence and give the effect of it on my mind.

The premises in question are a part of Harsimus cove, which was a shallow bay jutting, so to speak, into the land between the piece of high land upon which is situate the city of Jersey City, and that upon which is situate the city of Hoboken. Those two pieces of high land were originally separated from the high ground known as the Palisades by a small tidal stream and were connected together by a strip of low land which was but a few feet above the level of high tide and about a mile in length, and an average of half a mile in width, and which faced the cove or bay. This strip, in the first part of the last century, was owned by one Coles. The cove itself, during the same period, was artificially bisected by the long dock, now the terminus of the Erie railroad, and substantially the same property which was the subject of dispute in the case of *Gough* v. *Bell*.

The part of the cove here in question lies immediately north of the long dock property and between that and Hoboken.

From time to time various maps have been made of the whole district, covering in one plate as well that above as that below high tide, laying it out into streets and squares, and those maps have shown streets running north and south and east and west, across the waters of the cove, with piers and docks and the like, none of which actually existed.

As early as 1804 one was made by one Mangin, known as the "Mangin Map," which, while attempted to be followed, has really been abandoned (and vacated by legislative action) because a careful survey shows that later maps did not follow it, and none of the streets laid out on the Mangin map cover the *locus* here in question.

Later on other maps were made by other surveyors laying out all the land, including the waters of the cove, into streets, running northerly and southerly, easterly and westerly, nearly parallel with and at right angles to the shore line.

These maps were made for various purposes, one for the purpose of laying out sewers for the prospective city or town, which should be built up on the land facing Harsimus cove, which was then named Pavonia, and another by commissioners appointed to devise a plan for a public water-works system. But there is no proof that any of them which showed streets laid out across the cove were authorized by Coles, or his successors in title, or were filed by Coles, or given that character which belonged to the "Loss" map made by Colonel Stevens and dealt with in the case of *Hoboken* v. *Hoboken Land and Improvement Co., supra*.

A series of streets were laid out at right angles to the shore line and, commencing with Pavonia avenue, were numbered thence North First, North Second, &c. The property of the long dock or Erie railroad terminus was bounded on the north by the centre line of North Fourth street, afterwards and now known as Twelfth street, and next above that was North Fifth street, now known as Thirteenth street, and other streets followed.

The territory within the side lines of North Fifth or Thirteenth street, when extended out over the waters of Harsimus cove, is the *locus* here in controversy. The distance between

the original shore line on this street'and the present dock front in the river is about fifteen hundred feet. The piers extend eight or nine hundred feet farther into the river.

Up to about the middle of the century there was nothing on the land, so far as appears, to indicate just where Twelfth, Thirteenth and Fourteenth streets would lie when actually laid out. They were not staked out or worked nor were any buildings put upon them.

There were, however, streets running north and south on the high ground, which were opened and used as public ways from Jersey City to Hoboken. They are now named Henderson street and Grove street, Henderson street being the most easterly.

The line of high-water mark in that immediate neighborhood did not run parallel with those streets, but cut them diagonally from northwest to southeast, and east of and parallel with Henderson street (which was then called Prospect street) was Provost street, which at its northerly end met the waters of the cove in the neighborhood of Thirteenth street.

Upon these maps, which were made between 1840 and 1860, the line of high-water mark was laid down with substantial accuracy; and the parts of the maps showing land above high-water mark were shaded to distinguish them from land covered with water.

Twelfth street was never used east of Provost street, but was occupied entirely by the Erie railroad for railroad purposes, and immediately north of that and east of Provost street the waters of the cove washed the shore, and the tide rose and fell over the strip of land here in dispute.

Most of these maps were filed in the county clerk's office.

After these maps were so made draftsmen, in preparing descriptions in conveyances of the land in the cove covered by high water, made references to these streets as if they really extended out into the Hudson river. This practice was adopted as a convenient mode of designating boundaries and points inaccessible because covered with water.

The outermost of the paper streets running north and south was called Hudson street, and was substantially a straight line

drawn from the most easterly point of Jersey City to the most easterly point of Hoboken.

Shortly after one, and possibly two, of these maps had been made, and the lines of Twelfth, Thirteenth, Fourteenth and Fifteenth streets and others could be determined by measurements on the ground from other known monuments, namely, on April 19th, 1852, and just before the final decision of the court of errors and appeals in the case of *Gough* v. *Bell,* the heirs of Coles conveyed to Mather & Baldwin a strip of land five feet wide abutting on the shore line as marked by high water, and extending from the centre of North Fourth street, now Twelfth street, northerly, several hundred feet, crossing North Fifth, Sixth and Seventh streets (now Thirteenth, Fourteenth and Fifteenth streets) to, I believe, the Hoboken line. This conveyance presumably carried with it the right of reclaiming the land between high and low-water marks, as such right had then been declared by the supreme court in *Bell* v. *Gough,* and as it was shortly afterwards declared by the court of errors and appeals in that case. This tract of land came by mesne conveyances to be vested in the Jersey Shore Improvement Company, by deed dated December 2d, 1856.

The license contained in the charter of the Jersey Shore Improvement Company, to whom the riparian grant in this case was made, is as follows:

"That the said company are authorized to improve all and every portion of the said lands and lands under water, held or purchased by them as aforesaid, by erecting buildings, and laying out said lands into lots, streets, squares, docks, lanes, alleys, or other divisions, and by leveling, grading, raising or tunneling the said lands, streets, lanes and alleys, and they shall have liberty to fill up, raise, occupy, possess and enjoy as their own property *all lands covered with water which they may hold or purchase, and may build, enlarge and improve all and any wharf, bulkhead or bulkheads, piers, slips and other structures which they may deem necessary for commercial, shipping or other purposes,*" &c.

"That the said company shall have the right to collect, receive, demand and sue for all wharfage, dockage and cranage, which may be levied upon any wharf, dock, pier, slip or bulkhead, erected by them upon their said land, by virtue of the preceding section." *Acts of 1854 p. 191.*

That company, or its immediate predecessors in title, constructed or attempted to construct a bulkhead by sinking crib-

work on a line which was intended to be an extension of the outer line of the Long Dock Company toward Hoboken, and it filled in the cove just behind the bulkhead so constructed in order to maintain it in its place, but it did not extend it all the way to Hoboken; with the result that the cove behind it was still flowed by the tide, and boats and scows floated in there freely. And I may mention here that such bulkhead, or the one farther out, which was subsequently built, never did reach Hoboken. The fact is that a ship canal crosses the bulkhead line and extends many hundred feet toward the original shore line.

By means of scows transporting New York street refuse, the owners commenced gradually to fill in the cove, and, as I think the evidence shows, the commencement of that work was on the southerly side of the tract, next to the Erie railway property. The fill, however, was imperfect, and at first was not high enough to prevent a high tide from covering it; but usually persons could walk over it and wagons could be driven over it.

That filling was continued from time to time with imperfect and unequal but increasing results down to about the year 1880.

In the meantime a new bulkhead was built several hundred feet farther out into the river, and of a more substantial character, and piers were erected projecting into the river.

A filling was made which practically extended Thirteenth street from the high-water mark to a slip between two piers or docks, the words seem to have been used as synonyms. This was done some time about the year 1865, and the purpose of it was to give communication by a causeway from a warehouse situate on the high land at the foot of Thirteenth street, as it actually existed on paper on the high land, across the cove to the piers or docks. The northerly one was called the California dock and the southerly one was called the Valentine or Tobacco Inspection dock.

A firm of Jarvis & Henwood bought a block of land from the heirs of Coles, bounded west by Provost street and north by Thirteenth street. The northeasterly corner of the block encroached upon what was originally a part of the cove, that is, the shore line ran across the northeasterly corner. They built a large tobacco warehouse on this block.

Morris & Essex R. R. Co. *v.* Jersey City.

On December 1st, 1865, the firm of Jarvis & Henwood, consisting of A. S. Jarvis and Harold Henwood, took from the Jersey Shore Improvement Company two leases, one for the bulkhead and pier, the latter of which was probably not yet quite finished, which lay to the south of Thirteenth street extended, sometimes called the Valentine pier; and the other for a square of land between the bulkhead (which is supposed to correspond with the paper street called Hudson street as laid down on the maps) on the east, Thirteenth street on the north and the paper street known as River street on the west.

These leases were evidently the result of a former contract, oral or written, but which, if written, was not produced. They created a term of twenty-one years from and after the 1st of May, 1869, as to the dock and twenty-one years from the 1st of November, 1867, as to the square of land, and were made subject to a right reserved to the shore company to place railways or tramways and to run cars upon the same, in each and any of the streets by which the said square was bounded.

The leases were both surrendered by Jarvis & Henwood, and the surrender accepted by the improvement company by deed dated February 26th, 1872. Thus all rights arising under them were extinguished.

A letter written by Jarvis & Henwood to Mr. Phelps, an officer of the Jersey Shore Improvement Company, dated November 4th, 1865, about two months before the execution of the leases, indicates the condition of the causeway at that time. It reads in this wise:

"We find the road leading from our warehouse to the dock leased from the Jersey Shore Improvement Co. to be almost impassable in rainy weather, and propose to lay a plank road at our own expense if the Jersey Shore Improvement Company will return us one-half the cost, provided the sum paid by them does not exceed one thousand dollars.
"Respectfully,

"A. S. JARVIS & Co.

"P. S.—After the completion of the road as proposed we will make no further call for repairs to said road from the Jersey Shore Improvement Co."

It is quite clear from the evidence that the causeway or embankment in question was erected mainly by Jarvis & Henwood for their own use. They used it for the transportation of tobacco between the docks and their warehouse.

On June 24th, 1864, the Jersey Shore Improvement Company gave to Mr. A. S. Jarvis (one of the firm of Jarvis & Henwood) individually a contract for a lease, which provided for the completion of a wharf, or dock or pier, at the foot of North Fifth street to the north of that street, of certain dimensions, and for its leasing to Jarvis for a term of ten years from May 1st, 1864, the first five years at $8,000 and the next five years for a rent based on a new valuation. In it the shore company agreed to have North Fifth street so far filled in and raised at the completion of the pier *that a railway might be constructed thereon, and to waive all right to oppose or hinder the construction and operation of a railway in said North Fifth street,* and to furnish material for the construction of a railway track connecting said pier with the track of the Erie Railway Company of the value of $2,500.

A lease in pursuance of that agreement was executed on March 27th, 1865, by the Jersey Shore Improvement Company to Jarvis alone, for the pier mentioned in that agreement, with the privilege of the bulkhead between the pier so demised and the one to the south of the centre of Thirteenth street extended, which, as we have seen, was leased to Jarvis & Henwood.

That lease was never surrendered, but presumably expired by its own terms. But, as I understand the evidence, Mr. Jarvis used the leased premises, or a part of them, until at or about the time the complainant the Morris and Essex Railroad Company acquired the title to the property, and his successor, Mr. R. M. Jarvis, has since had the use of the slip or dock, which is immediately at the foot of Thirteenth street produced, and between the two piers, for the purpose of landing goods to be used at his tobacco warehouse (the same erected by Jarvis & Henwood), the use of which it appears that he has retained up to the present time, and has paid the Delaware, Lackawanna and Western Railroad Company therefor.

He is the party who has promoted the action of the city taken to enforce its claim that the causeway in question is a public

street, and he took the stand as a witness for the defendant. His evidence naturally proved to be the strongest of any produced against the complainants. He, however, admitted paying rent to the complainants as owner of the docks and piers, but attempted to distinguish between rent for the pier, which he admitted belonged to the complainants, and rent for the bulkhead or dock at the foot of the street, so-called, which he claimed was free to the public. In this attempt I think he failed.

It was, moreover, proven that although he had attempted to resist payment of rent for a year or two, he finally did pay it to Mr. Reasoner, the superintendent of the complainant the Morris and Essex Railroad Company, before the death of that gentleman.

Somewhere at or about the date of these leases (1865) the filling in and forming of the causeway from the tobacco warehouse to the slip between the two docks was so far completed as to be capable of being used for drays, and the contents of Jarvis & Company's letter of that date, referred to above, shows that it was barely above high-water mark, and in that respect agrees with the evidence of numerous witnesses on that subject.

The plank road spoken of in that letter was laid down by Jarvis & Henwood, and was maintained for many years. The causeway was used mainly by those gentlemen in the conduct of their business, which seems to have been extensive and to have consisted of storing and inspecting tobacco. It is spoken of in the evidence as the "tobacco inspection."

But the mariners who brought the tobacco to the docks needed supplies of various kinds, and naturally opened trade for ship-chandlery and the like with the Jersey City tradesmen, and the latter used the causeway for the delivery of their wares to the mariners; and peddlers who sought markets for their wares also used the same causeway for the same purpose. Besides these occasions for *quasi* public use Jarvis & Henwood leased storage room on the docks covered by their leases and the square of land behind it to other parties, who brought sand, lime and other heavy building materials by water to the dock and delivered them there to purchasers. This made it necessary to use the causeway for distributing their wares.

The great weight of the evidence is that all persons who used the docks paid therefor to Jarvis & Henwood, and most of the persons who used the causeway did it· by the consent, either express or implied, of the same persons. The proof is abundant on this subject.

But peddlers and other persons seeking to reach the ships lying at·the dock attempted to use, and sometimes did use, the causeway and plank road without the consent of Jarvis & Henwood, and those gentlemen, in order to protect themselves in the premises, erected a gate, and I think the evidence warrants the statement that they erected two gates, across the causeway—one near their warehouse and the other near the docks. It is hardly worth while to spend time in commenting on the significance of this act on the question of dedication to public uses.

Besides this occasion for travel, Jarvis & Henwood leased to some person the right to erect a small shanty, either on the dock or on the square of leased land near it, to keep a little store for trading with the mariners; and another store of the same character was at one time kept in a barge or float near the dock; and at one time, for a short period, a floating chapel, which belonged somewhere in the New York waters, was moored there for religious services on Sundays.

When the persons desiring access to the docks were prevented by the gates from using Jarvis & Henwood's plank road they managed to reach the docks by traveling *extra viam,* which they were able to do in dry weather; for immediately after these leases were executed the shore company prosecuted the work of filling in the cove to the north of the causeway, and did it, imperfectly it is true, but in such a manner that at a low tide in a dry time wagons could drive across in almost any direction.

·Later on, both before and after the Morris and Essex Railroad Company acquired title, a more thorough filling in and reclamation over the whole of the land was effected by means of temporary railway tracks laid thereon, and the·imposition of a further earth filling to the extent of some three or four feet. This filling covered the whole space, including the causeway, and obliterated the appearance on the surface of the sewer (presently to be mentioned) and its manholes and other apertures, with the

result that the driveway over the line of Thirteenth street extended became fairly passable.

The use of the driveway continued to be of the same and of no other character. It was confined entirely to persons having business at the dock either with mariners or with persons engaged in selling building materials there and the like.

When the railroad company came to build its piers and sheds thereon it made the neighborhood of the foot of Thirteenth street extended its station for the receiving of general merchandise by floats to be shipped to the interior, and it became necessary and convenient for the company to have access for teams to these piers and docks; but the use of the way was confined to that sort of traffic. It never was a thoroughfare leading to any public place. There was no ferry or general public travel over the causeway and over the docks for any public conveyance.

The complainant covered substantially the whole space north of Twelfth street, except the canal, with its railway tracks. These tracks spread out like a fan from the northwest corner of the cove as it originally existed. Several of them crossed the line of Thirteenth street as claimed, and a space was left between the lines of tracks for a wagonway to the dock.

These are the acts of dedication upon which the defendants rely.

In addition to these open acts of dedication of the street itself the defendants rely upon the verbiage of the descriptions in the three several leases above set forth given to Jarvis & Henwood, and to Jarvis, and to language in some conveyances and cross-conveyances and releases made and entered into between the former owners of this property and the Hoboken Land and Improvement Company, in which reference is made to these streets for descriptions of the land then wholly or partially under water; and they also rely particularly upon the language of the application to the riparian commissioners for the riparian grant, and the language used in those grants and the maps thereto annexed.

I have examined all these documents with care.

In the descriptions contained in the Jarvis & Henwood leases it must be admitted that the language used indicates actual

streets, but whatever of individual rights accrued under those leases have become extinct, either by their expiration or by their surrender. No private rights now exist under them, and the city, as we have seen, has never taken advantage of them by declaring the street to be a public street, or working it as such, nor has the city ever been invited to do so by the owners of the land.

With regard to the conveyances passing between the present and previous owners, and between those and the Hoboken Land and Improvement Company, I find that in almost every instance where the numbered streets are mentioned they refer to a description of the five-foot strip of land bordering on high-water mark which was conveyed by Coles to Mather & Baldwin, and where, they refer to these streets in the description of the cove proper they use the words "lines" of Twelfth street or Fifteenth street "extended," "or if extended," or "continued," or "lines parallel" to the lines of those streets, showing, manifestly, that they refer to imaginary lines, the location of which is to be ascertained by the actual lines of the streets named, as laid down on the land above high-water mark. And this remark applies also to the application to the commissioners and to the two riparian grants. With regard to the maps annexed to those grants they show the streets on the high land by their lines, but the lines of those streets are not extended or marked as such on the land, which was once covered by the tide and which was conveyed by the grants. In short, a careful examination of the deeds relied upon by the defendants and offered in evidence and found in their printed book, and the maps annexed to the grants, do not sustain the argument which the defendants' counsel has based upon them.

Moreover, the agreements, deeds and leases in which those streets are mentioned are all, so to speak, between the parties, and none of the parties, except the present Mr. Jarvis, has ever claimed any right of way over the premises under them. And his claim is that the driveway is a public street. He never has been prevented from having access over it to and from the dock or pier, or both, which he has used as tenant of the complainants.

That the grant of a, right, however temporary, to use the docks for purposes of transportation would include by implica-

tion a right of reasonable access thereto from some public street is too plain for argument. By reasonable access is meant that it could be traveled and used by ordinary conveyances. And here we have the whole origin of the notion that the causeway in question is a public street.

In addition to these matters, defendants rely upon certain acts of the public authorities, the principal one of which is the laying of a sewer down from the high land through Thirteenth street, and I believe also through Fourteenth and Fifteenth streets, to the river. The only one about which any evidence was given was that in Thirteenth street. That was put down by the city not later than the year 1870, and manholes were left in it at stated distances, and openings placed for taking in water from the gutters, if there ever were any there formed. The result of the placing in of this sewer indicates clearly the condition of the street. The manholes were far above the surface of the ground, and I think the evidence shows that the top of the sewer was about level with the top of the ground, so that vehicles could not drive over the sewer at all, but were obliged to go on one side or the other of it.

All that the city has ever done toward the making or maintenance of this causeway was to smooth off and level up the earth after placing a sewer therein, so as to leave the earth in its former condition.

Then, again, water pipes were laid down some one of the streets by the private water works company which then supplied Jersey City, and distributed along the bulkhead to supply the wants of the business there transacted.

One other act relied upon by the city is the making of a grade map fixing grades of all the streets in the city, in which was included the paper streets across this cove, including Thirteenth street.

In 1869, by an act approved April 2d, and entitled "A supplement to an act entitled 'An act to incorporate the Jersey Shore Improvement Company'" (*P. L. of 1869 p. 1214*), the legislature enacted that it should not be lawful to lay out or open upon any of these lands any street running northerly and southerly between North Fourth street and the southerly line of

Ferry street, Hoboken, and east of Provost street and west of Hudson street, as said last-named street is located by an act entitled "A supplement to an act entitled 'An act to incorporate Jersey City,'" and "all such streets so laid out or projected over the said property within the limits aforesaid shall be and are hereby vacated." This act recites that no streets have yet been actually laid out by the municipal authorities of said city over the shore improvement company's lands.

Though Hudson street was mentioned in this act, it was never prepared, opened or used as a street, and there is no evidence from which it can be inferred that it ever had any attribute of a public or even private highway. It was never anything more than a mere paper street, referred to for the sake of description and location. In fact, a person passing eastward over the causeway in question could go no farther than the river.

The case in question is in marked contrast with one which would result from the opening of a causeway across the cove from Jersey City to Hoboken parallel with the river, with an outlet at each end into the public streets of those cities. In such a case the passageway would have been from one public street to another, and the travel over it might have been by individuals as members of the general public.

With regard to the sewer, it is to be remarked that while it is usual for the municipal authorities to lay sewers through streets, the practice is by no means universal, and the sewer as a sewer may be just as efficient, and in many instances more so, if laid over private lands. It is for the benefit and advantage of the street that it should have a sewer running through it to take off the surface-water and the sewage from the dwellings, if any, on either side; but if the street be not worked and there be no dwellings on either side so as to require neither a provision for surface-water nor one for sewage, then there is no advantage to the street to have a sewer laid through it. In the present case it is a matter of indifference to the municipal authorities, who are providing for the disposal of the sewage of the adjoining high ground, now and only within a few years built up and occupied by dwellings, whether that sewage shall be conducted across Harsimus cove through a street, or over

private land. It is true that it appears clearly that the municipal authorities laid an assessment on the Jersey Shore Improvement Company for a share of the expense of the laying of this sewer, and the assessment was paid. But it does not appear that the detail of the assessment, the principle upon which it was made up, was ever brought to the attention of the landowner; and the fact that the landowner was willing to pay an assessment rather than contest the right of the city to levy it, is no evidence that he knew of or approved the mode of assessment which was, as appears by the evidence, on the basis of building lots twenty-five feet by one hundred feet, laid out on each side of the street, when in fact the street had never been worked or shaped as a street and no building lots had ever been laid out or were proposed to be laid out and none had been sold. But, as I understand the evidence, the payment was made by Jarvis & Henwood and not by the Jersey Shore Improvement Company.

By the riparian grant of 1871 the docks and wharves and piers were undoubtedly private property, to which no person had a right of access or use except by the consent of the owner. All the boats and barges that tied up there did so by the consent of the owner. The use was permissive and not of right. All persons who went there to trade with the mariners must have had the consent of the owner; the one or two little ship-chandler shops that were erected on the dock were so erected by the consent of the lessee of the owner, and paid rent to him; those who used the causeway did it by the like consent. None were there in the exercise of any public right. The whole use was precatory, and never of right, except as between the lessor and lessee, and that arose by the force of the lease, and whatever right arose thereout terminated with the lease or leases.

Now the question is whether, under those circumstances, the building of the causeway and the suffering the use of it to the extent and in the manner which has been described, amounted to a dedication of it to the public. I am of the opinion that it did not.

The owner of a large tract of land may establish a factory in the interior of it and open a lane from a public highway leading to that factory. He may erect dwellings thereon for,

and rent them to, the operatives. That may lead to a trade between the operatives and the outside world, bringing visitors, tradesmen and peddlers there, so that considerable travel would occur over the lane; but all that would not make it a public highway, unless the owner solicited the public authorities to accept it as a highway and assume the burden of its repair, and they did so; or unless it extended entirely across the owner's land from one public highway to another, and he permitted its use by the general public.

In the case just supposed, whenever the owner chose to abandon his factory and eject the tenants from his dwellings and stop business, the public would have no right to come upon his premises, and he might close the lane entirely, or open another one in some other place to suit his own convenience.

So with this causeway; it happened that it was in the direct line of the extension of a street on the high land known as Thirteenth street; and it so happened that conveyances of lands under water, upon which no fixed monuments had been or could be erected, were made referring to certain paper streets as boundaries, and it was convenient to make leases of a pier and bulkhead fixing the location of the leased premises by reference to the extended lines of the paper streets laid out on the upland; and it so happened that the tobacco warehouse was located on the upland on one of these paper streets, and a convenient place for a road between the warehouse and the dock was along or nearly to the centre of this paper street, and hence it was constructed at the expense of the parties for their own use, and was used for access to the dock. But all that did not give it the qualities of a public street, because it did not connect two public places or thoroughfares, and was not open to the general traveling public, was never constructed or maintained by the public, and yet it was called Thirteenth street, and many people supposed it to be a public street. I do not think it worth while to enter upon a discussion of the law on this subject further than to refer to the well-considered opinion of the late Justice Lippincott in *New York and Long Branch Railroad Co.* v. *Amboy, 28 Vr. 252.*

With regard to any supposed acts of dedication occurring after the last riparian grant, it is sufficient to say, if it does not already appear, that there was none from which any intention to dedicate can be inferred. On the contrary, as soon as the complainants obtained title, which was in 1881, they commenced to lay their tracks and devote the land in question to railroad purposes.

In 1882 the city attempted to stop their work of track laying and to remove their tracks, whereupon the complainants applied to this court by bill, and obtained an injunction against the acts of defendant. To this suit the defendant appeared and answered the bill; and complainants in due course took testimony before a master in support of their bill. The defendant did nothing, and the injunction still stands in full force.

Again, later on, the exact date I do not find, the city passed an ordinance for the paving of Thirteenth street, east of Provost street, and this ordinance was at once contested by the complainants by means of a *certiorari,* and testimony was taken by the prosecutors in support of their reasons. No testimony was taken on the part of the city. That suit has not been pushed by the city, and no further action was taken under the ordinance for paving.

The effect, then, of all the evidence on my mind is that there has been no dedication of this strip of land to the public use of a highway. Whatever use in the nature of a public use has been enjoyed was merely that of a private way leading to and from the docks, which were never public docks, and such use was never of right, but in all cases was permissive.

I will advise a decree for the complainants.