AMOS STONE *vs.* BOSTON STEEL & IRON COMPANY.

Where the shore line of a tide water cove does not depart much from a straight line, the flats may be divided by drawing a base line from headland to headland, and running straight lines at right angles with the base line from the ends of the division lines of the upland to low water mark, even if the sea never wholly ebbs beyond the base line, provided the situation and shape of the channel are not such as to require a dif-ferent mode of division.

Upon a tide water cove in which the legal dividing lines of the flats were at right angles with the base line of the cove, three lots of the upland were conveyed by parallel side lines which struck the shore obliquely, the deed of each lot describing it as having a boundary line of a certain number of feet on the shore, together with flats of that number of feet in width to low water mark. The side lines, if extended over the flats at right angles with the base line of the cove, would give substantially the specified width of flats; but if extended in the same direction as the side lines of the upland, would give a less width, and would, by means of intersecting the legal boundary of the flats belonging to a neighbor-ing estate, afford to one of the lots granted no access to low water. *Held,* that the side lines of the flats were not to be extended in the same direction as those of the upland.

WRIT OF ENTRY to recover a parcel of flats within the ebb and flow of the tide, on Mystic River in Charlestown. Tria₁ before *Foster*, J., who reported the following case for the deter-mination of the full court.

A plan made by a surveyor under order of the court showed

**that** the demanded premises were situated in the deepest part of a cove; that a base line drawn across the cove from headland to headland was at least three quarters of a mile long; the greatest distance at right angles from such base line to high water mark was about five hundred feet, and low water mark was almost entirely outside of, and nowhere more than a few feet within such base line. So much of the plan as is material to the understanding of the case was as follows:

Ebenezer Wait in 1790 acquired title to a tract of land on this cove, including the lots marked "N. Tufts," "D. Tufts," "Little," and "Hall," on the plan.

On the 10th of September 1797 Wait conveyed to Nathan Tufts a lot "bounded as follows: Beginning at a cedar post to the eastward of said Tufts's slaughter-house, and running westerly ninety-four feet on the river, then running southerly from the river into the lot two hundred and fifty-seven feet, then easterly ninety-four feet, then running northerly two hundred and fifty feet to the first mentioned cedar post, and likewise ninety-four feet breadth of flats adjoining the above described lot to low water mark, with all the privileges and appurtenances thereunto belonging." On the same day Wait conveyed to Daniel Tufts a lot bounded as follows: Easterly on the land so

conveyed to Nathan Tufts, "and running westerly on the **river** seventy-four feet, then southerly running into the lot two hundred and fifty-seven feet, then easterly measuring seventy-four feet to the land conveyed by said Wait to said Nathan Tufts as above mentioned, then running northerly to the first mentioned bound two hundred and fifty-seven feet, likewise seventy four feet breadth of flats adjoining the above described lot to low water mark, with all the privileges and appurtenances thereto belonging." On the 4th of July 1800 Wait conveyed to John Little a lot described as adjoining the land conveyed by him to Daniel Tufts, "and measuring on said Tufts's line southwesterly two hundred and fifty-two feet, and northwesterly on a street which I am to lay out two rods wide there measuring seventy-nine feet and an half foot, and then running on a line northeasterly on my land two hundred and sixty-two feet, then running easterly on the river to said Tufts's land seventy-nine feet and an half foot to the first mentioned bounds, together with the flats to low water mark of the same breadth of seventy-nine and a half feet, with all the privileges and appurtenances belonging thereto." These three lots were afterwards conveyed to the tenants.

Jonathan P. Hall, who derived his title under a deed of November 27th 1802 from Wait, conveyed on the 24th of April 1826 to Benjamin Adams a lot of land "butted and bounded as follows, to wit, westerly on land of Thomas Harris by a course northwesterly four degrees east till it comes to Mystic or Medford River and there measures about one hundred and seventeen feet, northerly by said river and measures on its course about sixty-seven feet till this line reaches land now or late of Mr. Little, easterly by land of said Little by a course north ten degrees east and there measures about one hundred and fifty feet, and southerly it is bounded on land late of Nathan Tufts and by land by him conveyed to Benjamin Weld" and on a passage-way, and there measuring on said land and passage-way about one hundred and two feet and four inches, "or however otherwise bounded, together with all the flats in front on said river thereto appertaining."

The lot next adjoining this on the west (marked "Harris" on

**the** plan) was purchased by John Harris in 1771, and on the 15th of December 1815 was conveyed under license of court by his administrators to Benjamin Adams, and described as bounded " northeasterly on Medford River," and " with all the flats belonging to the same and all the privileges and appurtenances thereto belonging, be the same more or less." The title of Adams in these two lots was afterwards conveyed to the demandant.

The demandant contended that he was entitled to the flats belonging to these two lots, and that they were to be ascertained by running a base line at high water mark between the headlands at the two extremities of the cove, and running two lines, at right angles with such base line, from the westerly boundary of the Harris lot and the easterly boundary of the Hall lot at high water mark to low water mark. The tenants denied that the side lines should be so run ; and contended that the side lines of their lots should be extended in the same direction as on the upland to low water mark.

*T. H. Sweetser & W. S. Gardner*, for the demandant.

*H. W. Paine*, for the tenants.

GRAY, J. In the division of flats between the proprietors of lands on the sea-shore no general principle is better established than that by which each parcel of flats, unless affected by the peculiar shape of the shore or the terms of particular grants, is to extend directly towards low water mark, and to be of equal width throughout. In *Gray* v. *Deluce*, 5 Cush. 12, Mr. Justice Wilde, speaking for the whole court, declared it to be a general rule which was intended, though not expressly stated, by the colonial ordinance of 1647, " that in all cases, when practicable, every proprietor is entitled to the flats in front of his upland of the same width at low water mark as they are at high water mark," or (which is precisely equivalent) " of equal width with his lot at high water mark." And in *Porter* v. *Sullivan*, 7 Gray, 443, Chief Justice Shaw said that the flats of each proprietor " must be in front of the land, that is, directly to the sea from which the tide flows, by lines as nearly as practicable perpendicular to the ine of shore, or the line of ordinary high water

mark." See also other cases cited in *Wonson* v. *Wonson, ante,* 79. In *Gray* v. *Deluce,* in which the shore of the cove formed a long and not deep curve, the flats were divided by running a base line across the mouth of the cove, and drawing parallel lines at right angles with the base line. That case indeed differed from this in not showing that the line of extreme low water was in any part within such base line; but the shore of the cove now in question departs even less from a straight line than in that case; the position or shape of the channel is not such as to require any different mode of division ; and it is admitted that the same rule is to be applied here, unless controlled by the terms of the deeds from which the parties derive their titles.

Although the proprietor of land bounding on the sea-shore may sell it with or without the adjoining flats, or with such portion as he pleases of the flats which he owns, the presumption is that any deed of a lot of land with the flats adjoining is intended to pass the grantor's actual right and legal title in the flats appurtenant to or parcel of the lot granted; and it is well settled that the side lines of the upland have no influence in deciding the direction of the dividing lines of the flats, unless referred to as guides in particular grants ; as, for instance, in *Dawes* v. *Prentice,* 16 Pick. 435, in which the side line of a parcel of flats granted was described in the deed as running parallel with the side of a certain wharf; and in *Winnisimmet Co.* v. *Wyman,* 11 Allen, 432, in which the legislature had granted rights to extend beyond low water mark wharves already built, and there was no evidence that the form of the shore was such as to control the reasonable inference that these wharves should be extended in straight lines. *Piper* v. *Richardson,* 9 Met. 158. *Curtis* v *Francis,* 9 Cush. 442.

The side lines of the three lots conveyed by Wait to Nathan Tufts, Daniel Tufts and John Little, respectively, and now constituting the tenants' estate, all ran parallel with each other, and struck the shore obliquely, so that the boundary line of each lot upon the shore was longer than the width of the lot if measured at right angles with the parallel side lines. Each deed describes the flats conveyed, not as being of the same width as the lot,

but as of the same number of feet in width as the boundary of the lot upon the shore. Neither of the deeds in terms declares an intention to extend the side lines of the flats in the same direction as those of the upland ; and upon a careful considera-tion of their language as applied to the situation and circum-stances of the flats in question, the court is of opinion that such an intention is not to be implied.

In the first place, the description of the flats as of the same width to low water mark as the boundary of the upland at the shore is not sufficient to require the side lines to be extended over the flats in conformity with the side lines of the upland, instead of in accordance with the legal boundaries of the flats belonging to the lot granted. *Piper* v. *Richardson*, 9 Met. 158.

In the next place, so to extend the side lines of the flats would not give a width of flats equal to the boundary upon the shore, as called for in the deed, but a less width. It is as plain as any proposition of geometry that the only way of making each parcel of flats equal in width to the boundary at high water mark is to draw the side lines of the flats at right angles with that line. *Kennebec Ferry Co.* v. *Bradstreet*, 28 Maine, 374. And side lines thus drawn substantially correspond with dividing lines at right angles with the base line of the cove, and are perhaps a little more favorable to the demandant than such dividing lines or than he asks for.

In the third place, the plan shows that if the side lines of each of these three lots should be extended in conformity with the side lines of the upland, the westernmost lot of the three, being that described in the deed from Wait to Little, would take by that deed no access whatever to low water mark, because both its side lines would strike the eastern line of the western lot of the demandant, which, " with all the flats belonging to the same," he holds under an earlier title, and the side lines of which must therefore, as both parties admit, be drawn at right angles with the base line of the cove.

*Judgment for the demandant.*