DEWEY LAND COMPANY et al., appellants,*

*v.*

HENRY E. STEVENS, JR., et al., respondents.

[Argued July 2d, 1913.  Decided June 15th, 1914.  Filed July 6th, 1914.]

On appeal from a decree of the court of chancery made by the chancellor.

(For principal opinion see *ante p. 314.*)

WHITE, J. (concurring).

So far as is essential to an understanding of this case, the facts appear to be that in 1852 Robert B. Leeds owned the entire tract shown on the following diagram, all of which was then fast land. In 1856, after some of it had been lost by the erosion of the ocean, he conveyed it to John McClees, describing it in the deed as bounding on the "edge of Absecon inlet." After much further erosion McClees, in 1897, conveyed it to the Atlantic Beach Front Improvement Company, by description also bounding on the ocean and inlet. In 1900 the high-water line was as shown on the diagram, and in that year Wm. H. Bartlett, the owner of lot marked B, to which he derived title from the Atlantic Beach Front Improvement Company, procured, as such owner, a riparian grant from the state for the land then under water included, as shown, within the dotted lines. In 1904, by reason of accretions, the high-water line was as shown on the diagram, and that year complainant received a grant of lot D, title to which also came from the Atlantic Beach Front Improvement Company. Still further accretions have since occurred and the high-water line is now as shown. In 1911 and 1912 complainant took quitclaim deeds from John McClees and from the heirs of Robert B. Leeds, respectively, for or including the triangle bounded by New Hampshire avenue, the eastwardly dotted line of the riparian grant to Bartlett, and the exterior line of the

---

* Printed out of place through inadvertence.—REP.

riparian commissioners, and that triangle is the *locus in quo.*
Defendants are the grantees from Bartlett of lot B and of the
lands granted to him by the riparian grant above mentioned.

I agree with what is said in the foregoing opinion regarding
*Attorney-General* v. *Sooy Oyster Co., 78 N. J. Law 394,* and also
with what was said as to the grounds stated for the decree from
which this appeal is taken. I also agree with what is said to the

42

effect that the recent quitclaim deeds to complainants from the heirs of Robert B. Leeds and from John McClees, respectively, conveyed nothing. *Yard* v. *Ocean Beach Association, 49 N. J. Eq. 306.*

What is further said in the opinion to the effect that the state acquires title to former fast land by reason of its having become submerged as the result of gradual erosion by the ocean is not, as it seems to me, involved in this case, and while true under certain circumstances and within certain limitations, seems to me to be stated so broadly as to be misleading. If McClees, for instance, had never granted away any of his fast land, but all of it, instead of only a portion of it, had wasted away by the gradual erosion of the ocean, and then, after one or two or three, years, or in fact any period short of that which would vest title in the state or its grantee by adverse possession, it had reappeared, the question would then be presented whether the new land belonged to McClees, or belonged to the state, or, as in *Ocean City Association* v. *Shriver, 64 N. J. Law 550,* to the state's independent grantee, if there was one, and doubtless in such case the decision would be, as in the *Shriver Case,* that it belonged to McClees.

In the present case, however, all of the McClees fast land did not wash away, and *the defendants,* as well as the complainants, claim under the grant made in 1897 from McClees to the Atlantic City Beach Front Improvement Company of the portion which had not washed away when he made the grant, and the grant bounded on the "high-water mark of the ocean." Complainants now own part of the fast land included in this grant, or part of the subsequent accretions thereto, and defendants another part of such fast land adjoining complainant's land on the west and extending to the ocean. It is true that defendants acquired from their predecessor in title, Bartlett, the riparian grant which he had received from the state, but this grant was made to Bartlett as the owner of part (now owned by defendants) of the McClees fast land, and at the time the grant was made it was bounded by side lines at right angles, or, substantially so, to the then shore line at this point, which, so far as the evidence indicates (and subject to the possible objection here-

inafter suggested but not involved under the amended complaint in this case), would seem to have been an equitable guide for the division of accretion gains should they occur. No question arises in this case, therefore, of a conflict between the accretions to which an owner of the shore is entitled and land of an independent grantee of the state in front thereof. It will be quite time enough to decide the rights of such a conflict when it shall have occurred.

In *Stevens* v. *Paterson and Newark Railroad Co., 34 N. J. Law 532* (at *p. 544*), this court said, speaking in an opinion by Chief-Justice Beasley: "From these authorities, and many others which might be cited, it appears to me to be plain, that by the rules of the ancient law, the owner of the land along the shore was entitled to no right as an incident of such ownership, *except the contingent ones before referred to of alluvion and dereliction,*" and, again, "if such a right (to build a wharf out beyond the high-water line without a riparian grant from the state) existed by force of the common law, as an incident of property, *it is obvious that it could not be destroyed or substantially impaired by the legislature without compensation.*" I take it, therefore, that instead of the *Stevens Case* being an authority to the effect that the state may make a grant to an independent grantee in conflict with the common law right of the owner of the *ripa* to accretions, it, in effect, says that the right to such accretions is incident to the ownership of the *ripa,* and that as such it cannot be taken away by the legislature without compensation, and such I understand to be the law in this state. *Bell* v. *Gough, 23 N. J. Law 624.*

In apparent recognition and confirmation of this view the legislature has provided, as I take it, that before an independent grantee from the state may fill the land under water in front of the land of a riparian owner who has failed to take out a state grant after notice, such independent grantee must extinguish such riparian owner's right to accretions by paying to him the value thereof, to be fixed by the riparian commissioners, subject to an appeal to the supreme court and to a trial by jury. The theory of this legislative provision would seem to be that the independent grantee from the state of land under water takes

what the state had, viz., *an ambulatory boundary,* shifting with the high-water line as erosion or accretion takes place, but upon the *exercise* of the granted right to fill, the riparian owner's right to accretions would for the first time be invaded, and that then, and then only, its owner becomes entitled to compensation. *Comp. Stat. p. 4389 § 20.*

In *Ocean City Association* v. *Shriver, supra,* the strip of fast land retained by the Ocean City Association when it granted lot No. 849 to Howell in 1884, and which intervened between such lot and the ocean, had *entirely* wasted away by the erosion of the ocean in 1895 so that the ocean washed upon the front part of Howell's lot. If it is entirely true, as stated, as I think, *obiter,* in the foregoing opinion in the case *sub judice,* that fast land "lost by erosion is lost forever," and "becomes the property of the state, not while it remains under water, but absolutely," it is difficult to see why Howell's, or his grantee, Shriver's, lot (No. 849) did not become endowed with the ownership of the *ripa,* and as such entitled to accretions and to take out a riparian grant from the state, and yet this court held in an opinion by Chief-Justice Depue—(1), that it had not become entitled to the accretions which formed by the receding of the ocean; (2), that the riparian grant which the state made to Shriver was void, and (3), that the Ocean City Association's land which had gradually entirely washed away and had been from three to five years under the ocean, so far from having been "lost forever" and from having "become the property of the state, not while it remained under water, but absolutely," not only did not pass by the state's grant of it, but actually belonged to the Ocean City Association, its former owner, when, within the period involved in that case, it reappeared by accretion, and this in spite of the fact that such former owner had nothing in the way of fast land to which the accretions could attach, and had received no grant from the new "absolute owner," the state. The only view consistent with such a result would seem to be the one stated by Chief-Justice Depue in that case as the solemn determination and adjudication of this court, viz., "that by the submergence the owner of the land does not *entirely* lose his property in the soil." Does not *entirely* lose it! Clearly, this

intimates that something is lost and says that something is not lost. What is it that is, and what is it that is not, lost?

I take it that what the owner *has* lost is his *possession* of his land, which has passed into the *adverse possession* of the state. I think the state's possession is adverse because it consists, under what is called the New Jersey doctrine, not only of the public rights of navigation, fishery, &c., upon and in the waters which overflow the submerged land, and which the state holds in trust for the use of the general public, but also of the emblem or sign of that ownership of the soil under navigable waters which was anciently part of the private regalia of the King of England (until abridged by Magna Charta, after which it was supposed it might be exercised by parliament), and which, as may be considered as now settled in this state, is vested in the State of New Jersey, and is within the exercise and control of its legislature. *Stevens* v. *Paterson and Newark Railroad, supra; Paul* v. *Hazleton, 37 N. J. Law 106; Wooley* v. *Campbell, 37 N. J. Law 163; Hoboken* v. *Pennsylvania Railroad Co., 124 U. S. 656.*

I think that what the owner has *not* lost is his right, within the statutory period in this state, to toll the running of such adverse possession and defeat its ripening into absolute ownership, by regaining possession of his land, not by bringing an action of ejectment, because such would be inadequate now, as in the days of King Canute, to stay the action of nature, but by actually ejecting the ocean from his land and restoring it by artificial means to its former condition as dry or fast land, or by having it, within the like period, restored to him through the voluntary action of nature should the ocean within that time recede. *Ocean City Association* v. *Shriver, supra.*

Such a view, taken in connection with the other familiar doctrine which saves the rights of the public against loss from adverse possession (*Hoboken Land and Improvement Co.* v. *Hoboken, 36 N. J. Law 540*), would return to the use of the public upon its reappearing from the sea, for instance, the portion of New Hampshire avenue south of a point about three hundred feet south of Pacific avenue, to which point the high-water line had encroached in 1900 when the state made a riparian grant for, *inter alia,* what was, before it was submerged, the bed of

New Hampshire avenue south of that point.  New Hampshire
avenue was dedicated as a public street to a distance of one
thousand five hundred feet or more south of Pacific avenue by
the ancient deed and map ("Rowland's") of dedication of April
15th, 1853, executed by Robert B. Leeds and others at a time
when the fast land extended one thousand five hundred feet
south of Pacific avenue.  If it be true that in 1900, when this
fast land had so wasted away that only about three hundred feet
of the one thousand five hundred feet remained, the state be-
came the owner, not merely while it remained under water, but
"absolutely," of the land so submerged, and, while such owner,
granted the submerged bed of New Hampshire avenue in 1900
to the predecessor in title of the defendants in this case, it is
difficult to see just how the public has regained its rights in
the portion (now about six hundred feet in length and continu-
ally increasing) of such bed so granted which has now been
restored by the recession of the ocean and is used and improved
as a public street.

But, however that might be, and returning to the question of
whether there is involved in this case a conflict between the ac-
cretion rights of an owner of the shore and rights under a state
riparian grant to an independent grantee of land in front of such
shore, no one pretends that in the present case the riparian grant
by the state to the defendants' predecessor in title, Bartlett, was
intended as or was a grant of any land under water not in front
of and adjacent to the grantee's high land at the time the grant
was made.  It was expressly made to depend upon his owner-
ship of such high land.  In other words, it was expressly con-
fined in its limits to the area which in case of natural accre-
tions would become a part of such high land by virtue of the law
of accretions according to the location of the high-water line *as
it existed at the time of the grant.  Gould Wat. § 163; Clark* v.
*Campau, 19 Mich. 327; Stone* v. *Boston Steel and Iron Co., 96
Mass. 230.*  Of course, changes are constantly taking place in
the high-water lines and in the direction thereof.  A shore which
one year was concave in its contour may a year later have become
convex.  The resultant effect upon lines projected at right angles
to it at various points during the process of transition to de-

termine boundaries between neighboring accretion gains, is hopelessly confusing and the consequent state of uncertainty in titles most injurious. A practical working system is necessary for the good of all, and where such a system has been established its fairness must be more than questioned, in fact, must be clearly overthrown, before the courts will feel justified in intervening. Such a working system seems to have been adopted by the riparian commission under its appointment by, and within the discretion vested in it, by the sovereign power of the state. Under this working system it takes the line of general contour of the shore in the vicinity, and, disregarding local or trivial or temporary indentations or excrescences, runs its division lines at right angles, or as nearly at right angles as is equitable under the circumstances, to such general line of contour *at the time it takes up the subject of making riparian grants in such vicinity,* and, then, subsequently, adheres as nearly as possible, or as is equitable, to the general division lines thus established, without regard to the fact that subsequent shifting of angles and locations of the high-water line may have brought about a condition, which, if it had existed originally, would have produced different results in the directions of such division lines. Not only do I fail to see any unfairness in this working system, but, on the contrary, I cannot see how any other could be practical. Where, therefore, as here, the riparian commission has made a grant, the bounding division or side lines of which run at right angles, if that is equitable, or if not, at such angle as, under the circumstances, is equitable, to the general contour of the shore at the time of the plotting or surveying of the vicinity for riparian granting, such lines will, I think, be upheld by the courts as a *practical and legal ascertainment* of the boundary lines of subsequent accretion gains to the adjacent high land should such gains occur. *Gould Wat.* §§ *162, 163.* This is so, I take it, not because the state, through the riparian grant, has vested in its grantee a title to land under water which survives when the land *by accretions to the adjacent high land* has ceased to be under water, but because the riparian grant, as here made, is by *its* very authority confined to the land under water in front of the grantee's adjacent high land, viz., to the land which would be-

come his by accretion to such high land should natural accretions occur, and, consequently, the division boundary lines defined in the grant are an authoritative ascertainment by the granting tribunal of the boundary lines of those accretion gains should they occur. *Gould Wat.* § *162.*

That this must be so seems to me apparent from the fact that the law under which riparian grants are made secures to the owner of the *ripa* the first right, during a stated period after notice, to receive a grant for the land under water in front of his high land. Surely, if one, owning land fronting on the ocean, in taking out a grant from the state of land under water in front of it, instead of having the side lines of the grant run substantially at right angles to the shore line, should have them run at an angle of ten degrees with the shore line and in front of the shore land of his neighbor who had received no notice and opportunity to take out his riparian grant in front of his land, such neighbor would have a perfect right to complain that he had been deprived of the privilege which this law secured to him, and of his common law right to the natural accretions to his land, without compensation, and, of course, to that extent the grant would be void. I take it, therefore, that now that new fast land has been formed by accretions to defendants' upland, the riparian grant in this case can only lawfully include the portion of such fast land which, under the law of accretions, might properly have become the property of the defendants without such riparian grant.

Whether, under this view, the state's grant to Bartlett is valid, in so far as it includes land on the opposite side of New Hampshire avenue from the location of the grantee's high land at the time the grant was made, is not before the court, because complainant sets up no title thereto except the recent McClees and Leeds's heirs deeds, and these, obviously, conveyed nothing. If complainants have any title to the *locus in quo,* it must be by virtue of its being an accretion to their high land on the east side of New Hampshire avenue, and the efficacy of such a claim of title would necessarily depend upon whether the owner of the former fast land, as it existed in 1853, in then dedicating and opening a public street, New Hampshire avenue, across the same,

to and at right angles to the ocean, had so divided his land into two parts and fixed the natural side lines of accretion gains for those parts, respectively, as to have rendered it inequitable for the state to have disregarded the lines so fixed in making its subsequent survey and grant. *Valentine* v. *Piper, 22 Pick. 95.* But, as before stated, that question is not, in my judgment, involved in, and is therefore not decided by, this case.

I concur, therefore, in so much of the foregoing opinion as holds that complainants are not entitled to a decree in their favor because the only title they set up, viz., the recent Leeds's heirs and McClees' deeds, has no substance, as the grantors in those deeds had nothing to convey (which I think is the only point involved in this case), but for the reasons herein stated I dissent from so much of that opinion as says (as I think, *obiter*), without proper qualification, that land "lost by erosion is lost forever," and "becomes the property of the state, not while it remains under water, but absolutely." If these assertions had been pertinent to the issue involved in this case, I take it that the first one, that land "lost by erosion is lost forever," should have been qualified by the insertion after the word "erosion" of the words "and remaining submerged by tidewater for twenty years," or words to that effect, and that the second one, that such land "becomes the property of the state, not while it remains under water, but absolutely," should have been qualified by adding thereto, what is stated in an earlier part of that opinion, viz., that such ownership is, of course, subject to invasion by accretions to the adjacent high land, which, should they occur, would belong to the owner of the *ripa,* unless he had been deprived of the right to them by proper proceedings and upon due compensation.