ALLEN, Judge.
Appellants, defendants in proceedings for a declaratory decree, appeal a final decree for appellee, plaintiff below. Appellee instituted the proceedings to determine its rights in the use of certain waterfront property, property acquired in part by deed in 1917 and in part by filling adjacent submerged land. Appellants, owners of two cooperative apartments situated on land adjacent to the subject property, opposed the use proposed by the city.
In 1917, after some negotiation, the city acquired certain described “water lots” from Marguerite Cook. The acquisition *172 was by deed for consideration, the deed reciting inter alia,
“Subject however to the following covenants and agreements which shall be and remain forever binding upon the grantee herein and upon its assigns. Namely: No structure of any kind shall ever be constructed, erected or maintained by the grantee or its assigns, on Water Lot Number Ten (10) hereby conveyed, and no structures of any kind, except open pavilions necessary for rest or protection from weather shall ever be constructed, erected or maintained upon any part of the remaining premises hereby conveyed, and no structure of any kind upon any part of said remaining premises shall at any time be used for any commercial purpose whatever. These covenants shall be construed as running with the land and it is intended and agreed that said covenants and each of them shall be for the benefit of Marguerite Cook, her heirs, executors, administrators, devisees or assigns the present and future owners of Lots 13, 14, 15 and 16, in Block 78 and Lots 6 and 7 in Block 79, and Lots 3, 4, 5, 10, 11, 12, 13 and 14, in Block 96 of the town of St. Petersburg, Florida.* * *"
In the same year the city filled adjacent submerged land and in 1918, by Special Act of the Legislature, acquired title to the latter land from the State. The city’s tract, both original and filled lands, was used as a park until 1962, when the city determined to use it as a parking lot for a new auditorium built nearby. Declaratory proceedings were instituted and appellants, who in 1958 had succeeded in title to adjacent land mentioned in the restrictive covenant, opposed the city’s plan. The final declaratory decree declared the filled land free of the deed’s restrictions and further declared that a parking lot was consistent with the restriction imposed on the land acquired by deed from Mrs. Cook. (The city disavows any intent to use this small tract as a parking lot — although under the terms of the decree they can.)
Appellants relied upon several legal theories in the lower court, but limit their argument here to a theory of estoppel, a theory predicated on allegations that the city, over a 35 year period, created and/or encouraged a belief that the subject property was dedicated and thus restricted to park purposes.
The lower court, in its final decree dated November 16, 1962, held:
“(2) That as of the date of the conveyance of the subject properties on September 15, 1917, such lands were submerged at mean high water as indicated in plaintiff’s Exhibit ‘D’ of its Bill of Complaint.
“(3) That when Mrs. O. L. Helsley purchased her apartment in the Waterfront Park Corp., she had been told by the real estate agent who made the sale that the subject properties were dedicated for park purposes.
“(4) That the real estate agent who made these representations was not an agent of the plaintiff City, nor had any act of the plaintiff City induced such representations.”
The court then further stated:
“ * * * that Marguerite Cook could by her conveyance to the City on September 15, 1917, restrict only the lands owned by her, which were the lands West of the aforesaid high water mark. Atlantic City vs. New Auditorium Pier Co. [63 N.J.Eq. 644], 53 ATL 99. At the time of her conveyance, Marguerite Cook owned the upland only, the title to the submerged lands being vested in the Sovereign State of Florida. Thiesen v. Gulf F. & A. Ry. Co. [75 Fla. 28], 78 So. 491 [L.R.A.1918E, 718]. It has been further established as a matter of law that the City by legislative grant of the State of Florida to-wit, Chapter 7781, General Acts *173 of 1918, received the balance of the submerged lands identified as those lands including, among others, the submerged portions of Water Lots 10, 11 and 12, and the South one-half of Water Lot 9, free of any restrictions.”
The court further found that the deed restrictions in the conveyance between Marguerite Cook and the City of St. Peters-burg on those lands lying west of the high water line as established in this cause for use as a parking area serving the Civic Auditorium structures located off the restricted premises were not a use which would be inconsistent with the deed restrictions as set out in such deed.
It further found that inasmuch as the deed restrictions applied only to the lands constituting the upland of Water Lots 10, 11 and 12, and the South one-half of Water Lot 9 on September 15, 1917, that any lands now filled beyond the line found in Exhibit “D”, or lands to be filled in the future by the City of St. Petersburg or its assigns extending the present existing upland to the East would be free and clear of any such deed restrictions.
The court further held that the city would not be estopped from asserting all legal rights which it might have over the properties acquired directly from the State of Florida.
We affirm the lower court.
In the case of Atlantic City v. New Auditorium Pier Co., 63 N.J.Eq. 644, 53 A. 99, (1902), it was held that where an owner of lands bordering upon high water mark in the tide waters of said State, who had not obtained the State’s title to the lands lying in front of his property and below the high water mark, had no power to charge the latter with any easement which would be forceful against a subsequent grant by the State of its title in those lands. The Court, in its opinion at page 107 of 53A., said:
"Secondly, the defendant insists that the restriction against building to the oceanward of the line of the board walk imposed by the deeds of Evans to Atlantic City, dated January 22, 1890, and the deed of Evans to Loper, July 22, 1895, never had any force to restrain the erection of buildings ocean-ward of the board walk below the line of high-water mark, where the defendant is now erecting the structure sought to be enjoined, because, the defendant contends, Evans never had title to the lands lying oceanward of high-water mark; that title to these lands was in the state of New Jersey at the time Evans attempted to charge them with the restriction above stated; that the defendant company’s piling is being driven at a place covered by the state’s title at the time Evans made the restriction against such structures; and that the restriction is inoperative. The power of an owner of lands lying at high-water mark to impose a restricting covenant in the nature of an easement upon lands lying below high-water mark is alluded to in the opinion of Vice Chancellor Reed in the case of Atlantic City v. Atlantic City Steel Pier Co. (N.J.Ch.), [62 N.J.Eq. 139], 49 Atl. [822], 825. The learned vice chancellor states his view that, as the riparian grant was obtainable only by the owners of lands at the high-water line, the riparian right, when received, was subject to the restrictions which the owners at the high-water line had previously imposed. The judgment there pronounced in no way depended on this passing expression of opinion, as it will be seen on examination that the learned vice chancellor based his final judgment upon other grounds. The decisions in which this question was elaborately debated do not appear to have been presented by counsel. In the case now under consideration this point has been argued with great energy as controlling the operation of the restriction against the erection of any building on lands lying below high-water mark. It appears, after con *174 siderable litigation, to have been settled as the law of this state that an owner of lands bordering on high-water mark, who has not obtained the state’s title to the lands lying below high-water mark, has no power to charge the latter with any easement which will be forceful against a subsequent grant of the state’s title. The supreme court of the United States, in the case of City of Hoboken v. Pennsylvania Railroad Co. (1887) 124 U.S. 656, 8 Sup.Ct. 643, 31 L.Ed. 543, passed upon the question whether a riparian owner ‘had power to dedicate to the public use as a highway any part of the land lying below high-water mark.’ The circuit court of the United States for this district had held that, as lands lying below high-water mark belonged to the state of New Jersey, they could only be dedicated or subjected to an easement by the state or its grantees. See first conclusion, page 664, 124 U.S., page 646, 8 Sup. Ct, and page 543, 31 L.Ed. The supreme court of the United States, on writ of error, affirmed this proposition. It declared that if a riparian proprietor attempts to create an easement in lands lying below high-water mark, and aft-erwards conveys to another his right to reclaim the land under water fronting his property, his grantee may acquire from the state the title to such land, discharged of the easement. This is the precise condition of facts which is presented in this case. Evans was the owner of land lying at high-water mark, but not of the state’s title to lands lying below high-water mark. He created an easement by a grant of a right of way for a board walk across lands above high-water mark, and, in aid of the full enjoyment of this easement, he attempted to impose a restriction against the erection of any building on lands lying below high-water mark. Subsequently he conveyed the lands bordering on high-water mark to Loper. The latter thereupon acquired a grant of the state’s title to the lands under water fronting the property he had purchased from Evans. The judgment of the United States has been accepted and followed in the supreme court of this state in the case of City of Elizabeth v. Central R. Co., 53 N.J.L. [491], 497, 22 Atl. 47, and in this court, by Vice Chancellor Pitney, in the case of Morris & E. R. Co. v. Jersey City [63 N.J.Eq. 45], 51 Atl. [387], 389. Under the exposition of the law pronounced by these decisions, the restriction against the building, etc., sought to be imposed by Evans, is nugatory, so far as it is invoked to affect the lands lying below high-water mark acquired by Loper under the grant from the state of New Jersey. The locus in quo the defendant is driving piling lies wholly below the line of high-water mark as it existed in July, 1895, the time when Loper received the state’s grant. See diagram. It must be held that the complainant has no right to a restraint against the defendant’s construction, so far as the complainant’s equity depends upon the restrictions sought to be imposed by the Evans deeds upon the use of lands lying below high-water mark. The operation of the restriction in the Evans deeds prohibiting the erection of any building oceanward of the board walk, so far as it might affect lands lying above high-water mark, need not be determined on this hearing, as the structure of the defendant here challenged is placed, as the proofs locate it, wholly below high-water mark.”
In Mayor, etc., of Hoboken v. Pennsylvania R. R. Co., 124 U.S. 656, 8 S.Ct. 643 at page 654, 31 L.Ed. 543 at page 552, (1887), the Supreme Court, speaking through Mr. Justice Matthews, said:
“ * * * The intent of this legislation is therefore manifest to treat the title and interest of the state in these *175 shore lands as a distinct and separate estate, to he dealt with and disposed of in accordance with the terms of the statutes — First, by a sale and conveyance to the riparian owner himself, or to his assignees; and, second, in case of his neglect to take from the state its grant on the terms offered, then to a stranger, who, succeeding to the state’s title, would have no relation to the adjacent riparian owner, except that of a common boundary. The title acquired by such a grantee, therefore, differs in every respect from that of a riparian owner to the alluvial accretions made by the changes in a shifting stream which constitutes the boundary of his possessions. The latter comes to him by virtue of his title to land bounded by a stream, and belongs to him because it is within the description of his original grant; but the title under the New Jersey grants is not only of a new estate, but in a new subject divided from the upland or riparian property by a fixed and permanent boundary.
“The nature of the title in the state to lands under tide-water was thoroughly considered by the court of errors and appeals of New Jersey in the case of Stevens v. [Paterson & Newark] Railroad Co., [5 Vroom 532], 34 N.J.Law 532. It was there declared, (p. 549:) ‘That all navigable waters within the territorial limits of the state, and the soil under such waters, belong in actual propriety to the public; that the riparian owner by the common law has no peculiar rights in this public domain as incidents of his estate, and that the privileges he possesses by the local custom, or by force of the wharf act, to acquire such rights, can, before possession has been taken, be regulated or revoked at the will of the legislature. The result is that there is no legal obstacle to a grant by the legislature to the defendants of that part of the property of the public which lies in front of the lands of the plaintiff, and which is below high-water mark.’
“It was therefore held in that case, that it was competent for the legislative power of the state to grant to a stranger lands constituting the shore of a navigable river under tide-water, below the high-water mark, to be occupied and used with' structures and improvements in such a manner as to cut off the access of the riparian owner from his land to the water, and that without making compensation to him for such loss. The act of March 31, 1869, as we have seen, afterward secured to the riparian owner the option of purchasing from the state its title to the shore, or, if granted to a stranger, compensation for the value of his privilege.
“ * * * In other words, under these grants the land conveyed is held by the grantees on the same terms on which all other lands are held by private persons under absolute titles, and every previous right of the state of New Jersey therein, whether proprietary or sovereign, is transferred or extinguished, except such sovereign rights as the state may lawfully exercise over all other private property.”
Since Marguerite Cook had ownership only to the high water mark, she could impress a restriction on the lands conveyed only as to interests which she owned. The property subsequently filled in by the City of St. Petersburg and the submerged lands instant thereto and submerged portions of water Lots 10, 11, 12 and the south half of water Lot 9 were conveyed to the city by Chapter 7781, General Acts of 1918. The city received such property through the State of Florida free from any restrictions.
We, therefore, affirm the lower court.
KANNER, Acting C. J., and OVER-STREET, MURRAY W., Associate Judge, concur.